**Samuel C. and Clare H. LOVENTHAL**

v.

**UNITED STATES of America.**

**Civ. A. No. 5990.**

United States District Court,
M. D. Tennessee,
Nashville Division.

June 29, 1972.

James I. Berry, H. Stennis Little, Jr., Nashville, Tenn., for plaintiffs.

Charles H. Anderson, U. S. Atty., Martha Johnson, Asst. U. S. Atty., Nashville, Tenn., Fred Luyties, Hubert M. Doster, Dept. of Justice, Tax Div., Washington, D. C., for defendant.

## MEMORANDUM

MORTON, District Judge.

This is an action for the recovery of $11,357.32 in additional federal income taxes and interest paid by plaintiffs for the calendar year 1967. Jurisdiction is founded upon the provisions of 28 U.S.C. § 1346(a) (1).

Taxpayers Samuel C. and Clare H. Loventhal filed a joint individual income tax return for calendar year 1967 with the District Director of Internal Revenue, Nashville, Tennessee. Taxpayers claimed, as an ordinary loss on their return, a loss that Samuel C. Loventhal (hereinafter referred to as "taxpayer") suffered from repaying a loan to a corporation, which loan he had guaranteed.

Upon audit of taxpayers' return, the Internal Revenue Service disallowed the claimed deduction for the loss to the extent that it was treated as an ordinary loss from a business bad debt. The Internal Revenue Service treated the loss as a nonbusiness bad debt under § 166(a) of the Internal Revenue Code (1954), thus resulting in a short-term capital loss. Taxpayers paid the tax deficiency and interest assessed as a result of the disallowance and filed a claim for refund. After receiving notice of disallowance of their claim for refund, taxpayers filed this suit.

The question presented is whether taxpayer's guarantee of a corporate loan and discharge of his obligations as guarantor by repaying of the loan constituted a loss from a business or a nonbusiness bad debt.

For several years prior to 1964, taxpayer was the dominant owner (sometimes the sole owner) of the capital stock of Loventhal Bros., Inc. This business, engaging in the general insurance business, began as a proprietorship in 1889 and was incorporated in 1941. Taxpayer individually was also engaged in the writing of life insurance, with Loventhal Bros., Inc. receiving 30 per cent of the first year's premium. The balance of the first year's premium and the entire amount of all subsequent premiums went to the taxpayer.

A short time before 1964, Loventhal Bros., Inc., an active and successful corporation, purchased the insurance business (insurance renewals) of a competitor, which was and still is in the construction business. The insurance portion of the business acquired consisted of insurance coverages initially sold to contractors, subcontractors and suppliers on the construction jobs of the construction firm. In addition, the construction firm had been successful in writing homeowners' policies and other types of policies for the purchasers of the homes constructed by the construction firm. In other words, this concern appeared to have a virtually captive market.

Taxpayer, impressed with the volume and caliber of this business, analyzed the situation and reached the following conclusions:

(1) A construction firm is a good source of insurance business through its purchase of its own requirements, i. e., workmen's compensation, builders' risk, public liability, etc.

(2) The construction firm could refer and be instrumental in writing insurance coverages from the purchasers of its constructed residences.

(3) The firm could influence its subcontractors and suppliers to purchase insurance from Loventhal Bros., Inc.

(4) The firm could refer life insurance (to pay off mortgage indebtedness of home purchasers, i. e., level amounts in reducing principal amounts as mortgage is reduced) to taxpayer individually.

One of the headaches of the general insurance business is to obtain prompt and efficient service in repairing damage occasioned by casualty loss. The construction company would serve Loventhal Bros., Inc. admirably in this capacity.

Taxpayer discussed these thoughts with the stockholders and employees of Loventhal Bros., Inc., of which taxpayer was the majority and controlling stockholder. After the stockholders agreed that such a project would be beneficial to Loventhal Bros., Inc., taxpayer individually, as distinguished from Loventhal Bros., Inc., and one William F. Clarkson, formed a construction company under the name of Old Hickory Construction Company, Inc. It was capitalized in the amount of $2,000, taxpayer and Clarkson investing $1,000 each. Since the corporation was a "thin corporation," both taxpayer and Clarkson signed a guaranty of the loan made to Old Hickory by a Nashville bank. This indebtedness ultimately reached $94,000. On the insolvency of Old Hickory, taxpayer paid $47,000 to the bank and claimed a deduction on his tax return as a bad business debt.

At the time of the formation of Old Hickory, taxpayer, within the context of the Internal Revenue Code, had two businesses, his employment with Loventhal Bros., Inc. and the writing of a small amount of life insurance.

As reflected by his tax returns, taxpayer had the following sources and amount of income.

| 1965 | |
|---|---|
| Loventhal Bros., Inc. (salary) | $ 9,100.00 |
| Dividends from public stocks | 37,847.96 |
| Life insurance sales (net commissions) | 6,166.21 |
| Farm loss | (10,904.90) |
| 1966 | |
| Loventhal Bros., Inc. (salary) | $ 15,358.00 |
| Dividends from public stocks | 38,065.71 |
| Life insurance sales (net commissions) | 4,546.06 |
| Farm loss | (11,715.18) |

Except for interest income and capital gains from the sale of securities, tax returns for 1967 and other tax years were substantially similar.

After the formation of Old Hickory Construction Co., and when the bank guaranty was signed by taxpayer, taxpayer had three businesses:

(1) an employee of Loventhal Bros., Inc.;

(2) a life insurance business; and

(3) an employee of Old Hickory Construction Co.

(Taxpayer asserts that he expected to draw a salary from Old Hickory when it began to make money. However, he never drew a salary from this corporation.)

The following facts are clearly shown by the record:

(1) Loventhal Bros., Inc. had no interest in Old Hickory Construction Co. and made no investment therein.

(2) Taxpayer's job and earnings from Loventhal Bros., Inc. were not contingent upon the success of Old Hickory.

(3) Any benefits to taxpayer through leads furnished by, or sales of life insurance to, customers of Old Hickory were minimal.

(4) The primary goal of taxpayer in the formation of Old Hickory was to aid Loventhal Bros., Inc.

Whether this loss was a business bad debt or nonbusiness bad debt depends upon the dominant motive of taxpayer in forming and investing in Old Hickory Construction Company.

"The issue's resolution is important for the taxpayer. If the obligation was a business debt, he may use it to offset ordinary income and for carryback purposes under § 172 of the Code, 26 U.S.C. § 172. On the other hand, if the obligation is a nonbusiness debt, it is to be treated as a short-term capital loss subject to the restrictions imposed on such losses by § 166(d)(1)(B) and §§ 1211 and 1212, and its use for carryback purposes is restricted by § 172(d)(4). The debt is one or the other in its entirety, for the Code does not provide for its allocation in part to business and in part to nonbusiness.

"In determining whether a bad debt is a business or a nonbusiness obligation the Regulations focus on the relation the loss bears to the taxpayer's business. If, at the time of worthlessness, that relation is a 'proximate' one, the debt qualifies as a business bad debt and the aforementioned desirable tax consequences then ensue." United States v. Generes, 405 U.S. 93, at 95–96, 92 S.Ct. 827, at 829, 31 L. Ed.2d 62 at 66 (decided February 23, 1972).

The issue in this case is clouded by taxpayer's dual status as an employee and stockholder of two corporations, and as an individual proprietor of a life insurance business.

"The fact responsible for the litigation is the taxpayer's dual status relative to the corporation. Generes was both a shareholder and an employee. These interests are not the same, and their differences occasion different tax consequences. In tax jargon, Generes' status as a shareholder was a nonbusiness interest. It was capital in nature and it was comprised initially of tax-paid dollars. Its rewards were expectative and would flow not from personal effort, but from investment earnings and appreciation. On the other hand, Generes' status as an

employee was a business interest. Its nature centered in personal effort and labor, and salary for that endeavor would be received. The salary would consist of pre-tax dollars.

"Thus, for tax purposes it becomes important and, indeed, necessary to determine the character of the debt which went bad and became uncollectible. Did the debt center on the taxpayer's business interest in the corporation or on his nonbusiness interest? If it was the former, the taxpayer deserves to prevail here. Trent v. Commissioner [of Internal Revenue], 291 F.2d 669 (CA2 1961); Isidor Jaffe, T. C. Memo, 1967–215; Estate of A. M. Saperstein, T. C. Memo 1970–209; B. A. Faucher, T. C. Memo 1970–217; Ida Rosati, T. C. Memo 1970–343; Rev.Rul. 71–561, 1971–50 I.R.Bull. 13." United States v. Generes, *supra*, 405 U.S. at 100–101, 92 S.Ct. at 831–832, 31 L.Ed.2d at 69.

■ The devotion of his time and energy to two corporations is not, without more, a trade or business of the one so engaged.

"In Whipple v. Commissioner [of Internal Revenue], 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), the taxpayer had provided organizational, promotional and managerial services to a corporation in which he owned approximately an 80% stock interest. He claimed that this constituted a trade or business and, hence, that debts owing him by the corporation were business bad debts when they became worthless in 1953. The Court also rejected that contention and held that Whipple's investing was not a trade or business, that is, that '[d]evoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged.' 373 U.S. at 202, 83 S.Ct. at 1174, 10 L.Ed.2d at 294. The rationale was that a contrary conclusion would be inconsistent with the principle that a corporation has a personality separate from its shareholders and that its business is not necessarily their business. The Court indicated its approval of the Regulations' proximate relation test:

"'Moreover, there is no proof (which might be difficult to furnish where the taxpayer is the sole or dominant stockholder) that the loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee. Compare Trent v. Commissioner [of Internal Revenue], supra [291 F.2d 669 (CA2 1961)].' 373 U.S., at 204, 83 S.Ct., at 1175, 10 L.Ed.2d at 295.

"The Court also carefully noted the distinction between the business and the nonbusiness bad debt for one who is both an employee and a shareholder." United States v. Generes, *supra*, 405 U.S. at 102, 92 S.Ct. at 832, 31 L.Ed.2d at 69, 70.

As to the dominant motivation standard, the United States Supreme Court said:

"The dominant motivation standard has the attribute of workability. It provides a guideline of certainty for the trier of fact. The trier then may compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective. As has just been noted, an employee-shareholder, in making or guaranteeing a loan to his corporation, usually acts with two motivations, the one to protect his investment and the other to protect his employment. By making the dominant motivation the measure, the logical tax consequence ensues and prevents the mere presence of a business motive, however small and however insignificant, from controlling the tax result at the taxpayer's convenience. This is of particular importance in a tax system which is so largely dependent on voluntary compliance.

"The dominant motivation test strengthens and is consistent with the

mandate of § 262 of the Code, 26 U.S. C. § 262, that 'no deduction shall be allowed for personal, living, or family expenses' except as otherwise provided. It prevents personal considerations from circumventing this provision.

"The dominant motivation approach to § 166(d) is consistent with that given the loss provisions in § 165(c) (1), see, for example, Imbesi v. Commissioner [of Internal Revenue], 361 F.2d 640, 644 (CA3 1966), and in § 165(c)(2), see Austin v. Commissioner [of Internal Revenue], 298 F.2d 583, 584 (CA2 1962). In these related areas, consistency is desirable. See, also, Commissioner [of Internal Revenue] v. Duberstein, 363 U.S. 278, 286, 80 S.Ct. 1190, 4 L.Ed.2d 1218, 1225 (1960)." United States v. Generes, *supra*, 405 U.S. at 104–105, 92 S.Ct. at 833–834, 31 L.Ed.2d at 71.

Applying the test as set out in *Generes*, the court holds that taxpayer's dominant motive in guaranteeing the loans to Old Hickory Construction Company was to protect and make more profitable his investments in both Old Hickory and Loventhal Bros., Inc. The dominant motive in the loan guarantees was clearly not to keep his job as an employee of either Old Hickory or Loventhal Bros., Inc. Taxpayer's job as an employee of Loventhal Bros. was not contingent on the existence of Old Hickory. The record so shows that his motive for the creation of Old Hickory was to further the corporate interests of Loventhal and not to create for himself a position of employment with Old Hickory.

As the court holds that the taxpayer's dominant motive in the loan guarantees was to protect and make more profitable his investments in the two corporations, Old Hickory and Loventhal Bros., Inc., and was not necessary nor proximately related to maintaining his status as an employee of the two corporations, the court hereby upholds the treatment of this loss as a nonbusiness bad debt by the Internal Revenue Service.

This Memorandum shall act as the final order in this case, and no further order shall be required.