## FRED AND LOUISE C. JEDDELOH
### *v.*
## DEPARTMENT OF REVENUE

Daniel A. Ritter, Harland & Ritter, Salem, represented plaintiffs.

James D. Manary, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered March 3, 1977.

CARLISLE B. ROBERTS, Judge.

Plaintiffs appealed to this court from the defendant's Order No. I 76-20, dated May 28, 1976, presenting one issue: should the $75,210.42 deducted on

the plaintiffs' Oregon personal income tax return for the tax year 1973 be classified as a business bad debt (as contended by the plaintiffs) or as a nonbusiness bad debt (as determined by the defendant's auditor and affirmed by the department, through its deputy director, in the denial of plaintiffs' administrative appeal)?

A corporation's bad debts are always business bad debts. However, the plaintiffs are individuals and they recognize that a noncorporate taxpayer's bad debts may be either "business" or "nonbusiness," depending on the facts in each instance. The tax treatment of nonbusiness bad debts is generally less liberal than the treatment of business bad debts, inasmuch as the latter may be deducted in full in the year they arise, whereas nonbusiness bad debts are treated as a short-term capital loss, of limited deductibility. IRC (1954), § 166(d). A noncorporate taxpayer's capital losses are deductible in any year only up to the amount of capital gains plus up to $1,000 of ordinary income. IRC (1954), § 1211(b) (before its 1976 amendment allowing $2,000). The amount not deductible in one year may be carried over and deducted in later years. IRC (1954), § 1212(b).

In this type of case, the facts are all important. The parties have stipulated that the plaintiff husband, Fred Jeddeloh (hereinafter referred to as "plaintiff"), was and is president and, since 1967, the major stockholder of Jeddeloh Brothers Sweed Mills, Inc., a corporation engaged in the manufacturing and distribution of lumber and plywood handling equipment. Plaintiff's "trade or business" is that of officer and manager of Jeddeloh Brothers Sweed Mills, Inc.* On or about 1964, plaintiff formed Ramic Corporation and was owner of 90 percent of its outstanding stock.

*Under federal personal income tax law, an individual's employment by a corporation may be deemed his "trade or business." *Maurice Artstein,* 29 CCH Tax Ct Mem 961 (1970). *But see Whipple v. Commissioner,* 373 US 193, 83 S Ct 1168, 10 L Ed2d 288, 63-1 USTC ¶ 9466, 11 AFTR2d 1454 (1963), *rehearing denied,* 374 US 858, 83 S Ct 1863, 10 L Ed2d 1082 (1963).

Subsequently, plaintiff's 90 percent stock ownership was reduced, first to 80 percent and finally to 40 percent by sales of capital stock to two investors. Plaintiff made loans directly to Ramic Corporation and guaranteed and eventually paid certain loans made by a bank to Ramic Corporation. In 1973, these debts in the net amount of $75,210.42 owed to the plaintiff by Ramic Corporation became totally worthless when the corporation was voluntarily dissolved.

In addition to the foregoing stipulated facts, the following facts were developed in testimony and are deemed by the court to be true:

Jeddeloh Brothers Sweed Mills, Inc. (hereinafter referred to as "Sweed") was incorporated in 1956 by the plaintiff and one of his brothers, with its main office at Gold Hill, Oregon. Plaintiff's capital investment was $20,000. Sweed's business consisted of manufacturing building materials handling equipment for use by lumber and plywood mills and other wood products manufacturers. Plaintiff was president from the time of the inception of the corporation to the time of this trial. In 1963, Sweed purchased a manufacturing operation at Independence, Oregon, unrelated to the Gold Hill activities, and plaintiff's two brothers actively managed the Independence operation. In 1963, plaintiff's stock ownership dropped from 50 percent to 20 percent.

The plaintiff, as president, was convinced that, utilizing the corporation's research and development funds, he could oversee the development of electronic controls which would add to the efficiency and salability of Sweed's materials handling equipment. Plaintiff strongly urged this policy in 1963, but disagreement developed among the brothers because there were not enough research and development funds for both the Gold Hill operation and the Independence operation. While plaintiff's major concern was for further investment in the Gold Hill's operation, the other brothers favored the operation at Independence. Plaintiff, as a

minority shareholder, was unable to prevent the board of Sweed from voting funds for Independence and refusing funds for Gold Hill. In 1964, plaintiff resolved to carry out his plans for Gold Hill nevertheless, and, as he testified, "finally went in for himself." He founded Ramic Corporation (hereinafter designated as "Ramic"), which he controlled as major shareholder and executive for the purpose of developing electronic control equipment compatible with Sweed's machinery. The original capital of the new corporation was $20,000 but soon after its formation, plaintiff purchased an additional $30,000 of stock. He took no salary. In 1965, plaintiff guaranteed Ramic's promissory notes to Bank A in the amount of $15,000. (Ramic also borrowed from Bank B but there is no evidence that plaintiff guaranteed or paid on debts to Bank B.) In 1964 and 1965, Ramic stock was sold to two Jackson County investors, reducing plaintiff's 90 percent holding to 40 percent. After these stock purchases, the new shareholders loaned to Ramic and guaranteed repayments for Ramic which were more than double the amounts plaintiff had loaned and guaranteed. In 1967, Sweed's Independence operation was spun off, leaving plaintiff as president of the Gold Hill operation and with 70 percent of the Sweed shares instead of the former 20 percent. While a minority shareholder and president of Sweed, during the period of 1963 to 1967, the plaintiff's salary was increased, up to the time of the split-off, in spite of the disagreements between the brothers-stockholders. (Upon becoming majority stockholder, his salary continued to increase.)

Plaintiff testified that in 1967, when he obtained a majority of Sweed's stock, he did not merge Ramic with Sweed because of his uncertainty of Ramic's future profitability. As a matter of fact, Ramic enjoyed no profit in any year and, early in 1970, it was faltering, there being a lack of orders due to the cyclical nature of the lumber industry. From 1964 to 1972, plaintiff had made personal loans to Ramic in

the sum of $66,500 and had guaranteed and repaid to a bank its loans to Ramic in a total amount of $15,880.82. Ramic voluntarily dissolved in February 1973, insolvent. After crediting recoveries against his payments, a net amount of $75,210.42 was owed by Ramic to the plaintiff at the time of the corporation's dissolution.

The bank loans obtained by Ramic and guaranteed by plaintiff were from Bank A. Sweed obtained its line of credit ($300,000, unsecured, in 1973) from Bank B. Plaintiff, individually and as president of Sweed, was "of considerable importance" in securing the line of credit from Bank B, according to Sweed's comptroller. (In 1975, the credit line was reduced to $175,000; prior to 1973, it was "a stable $70,000.") The plaintiff testified that his dominant purpose in forming Ramic was to protect his position as president of Sweed, and that he had to make good on his guarantees of Ramic's notes to preserve Sweed's lines of unsecured credit, without which Sweed would be inoperable and his "job" as president and chief executive officer would be worthless. For these reasons, he deemed that his losses should be treated as business bad debts rather than as nonbusiness bad debts for personal income tax purposes.

██ As stated in Research Institute, 5 Tax Coordinator, ¶ M-1303 (looseleaf page dated 10/9/75):

"A nonbusiness debt is a debt which is not a business debt and is not a corporate or governmental 'security,' such as a bond, note, or other evidence of indebtedness issued with interest coupons or in registered form.

"A *business debt* is either:

"(1) a debt created or acquired in the course of taxpayer's trade or business (whether or not it was related to that business when it became worthless) or

"(2) a debt the loss from whose worthlessness is incurred in taxpayer's trade or business. In this case, a debt is a business debt if the loss is proximately related to taxpayer's business when the debt becomes worthless.
\* \* \*

"A bad debt loss is proximately related to business if business is the dominant motivation for the debt. *U. S. v. Generes,* 405 U.S. 93, 31 L ed 2d 62, reh. den. 405 U.S. 1033, 31 L ed [2d] 491 [(1972)]."

■ Referring again to 5 Tax Coordinator, ¶ M-1309 (looseleaf page dated 10/9/75):

"*Loan to employer.* Serving as an employee for compensation is engaging in a trade or business. But the treasury says that loans by an officer or employee to the corporation employing him aren't business debts because they aren't related to his business and the corporation's business isn't his business. Tax Guide for Small Business, '75 ed., p. 99."

However, courts have not agreed with this statement as it affects the employee where facts reveal that the dominant motivation for the employee's loan is "proximately related" to the business. An excellent statement of the legal questions confronting the parties to this suit is set out in 5 Mertens, *Law of Federal Income Taxation* § 30.25, at 52-53 (of the copyrighted 1975 insert pages). *See also Trent v. Commissioner,* 291 F2d 669 (2d Cir 1961), 61-2 USTC ¶ 9506, 7 AFTR2d 1599, and *United States v. Generes,* 405 US 93, 92 S Ct 827, 31 L Ed2d 62, 72-1 USTC ¶ 9259, 29 AFTR2d 72-609 (1972), *rehearing denied,* 405 US 1033, 92 S Ct 1274, 31 L Ed2d 491 (1972).

It will be noted from the record that plaintiff's investment in Sweed may well have been minimal, since the only evidence in the record in this respect is that the plaintiff's investment in the corporation was $20,000 and, by 1969, the plaintiff's salary as president was $36,000 per year and more thereafter. It would be easier to infer that the plaintiff's dominant motivation, if he had made the loans and guarantees to and on account of Sweed, was for the purpose of maintaining his position and his income therefrom. But an intervening step must be studied, relating to the relationship between plaintiff, Ramic, Sweed and Banks A and B.

As stated above, all of the plaintiff's loans and

guarantees were related to Bank A and to Ramic, the corporation in which he was the principal stockholder and an officer without salary. The cases seem clear that if this were the only corporation involved, plaintiff's loans and guarantees were nonbusiness bad debts as to him, because he was not an employee of Ramic in the necessary sense (*i.e.,* his "job" did not depend on his monetary contributions).

There have been a number of instances in which a stockholder-employee of one corporation (corporation A) has loaned or guaranteed the debts of another corporation (corporation B) and has claimed that such loans and guarantees were made to protect his position with corporation A and that, therefore, the subsequent failure of corporation B gave rise to unpaid debts to the stockholder-employee from B which should be deemed business bad debts. No cases have approved this reasoning. The business-bad debt status was denied by courts in the following instances in which the facts are closely analogous to those in the present suit:

In the case of *Loventhal v. United States,* 346 F Supp 1318 (MD Tenn 1972), 72-2 USTC ¶ 9559, 30 AFTR2d 72-5154, *aff'd,* 478 F2d 311 (6th Cir 1973), 73-1 USTC ¶ 9422, 31 AFTR2d 73-1251, the taxpayer was a stockholder-employee of corporation A, who joined in forming corporation B (in a related line of business), becoming a stockholder-employee in B but receiving no compensation from it. Because of corporation B's thin capitalization, the taxpayer guaranteed loans made to it in the sum of $94,000 and on insolvency of corporation B, he claimed a deduction on his tax return as a business bad debt. The trial court found the following facts: (1) Corporation A had no interest in corporation B and made no investment therein. (2) Taxpayer's job and earnings from corporation A were not contingent upon the success of corporation B. (3) Any benefits to taxpayer through leads furnished by, or sales of life insurance to, customers of corporation B were minimal. (4) The primary goal of

[ 55 ]

taxpayer in the formation of corporation B was to aid corporation A. The court further found that the dominant motive in the loan guarantees was clearly *not* to keep his job as an employee of either corporation B or corporation A. Taxpayer's job as an employee of corporation A was not contingent on the existence of corporation B. The record, in the court's opinion, showed that taxpayer's motive for the creation of corporation B was to further the corporate interest of corporation A and not to create for himself a position of employment with corporation B. He was a loyal employee of corporation A and his job there was secure without B's influence. Consequently, the bad debt losses were placed in the nonbusiness classification.

In *Rookard v. United States,* 330 F Supp 722 (USDC Or 1971), 71-1 USTC ¶ 9457, 28 AFTR2d 71-5107, the case involved a stockholder-employee of corporation A who invested in corporation B, in a related line of business, whose loan he guaranteed; his job with A did not depend upon the survival of B and the debt which taxpayer was required to pay upon his personal guarantee of a bank loan to corporation B (in a futile attempt to save that corporation from insolvency) was held to be a nonbusiness bad debt.

The foregoing decisions, with understanding aided by a reading of *Estate of Martha M. Byers,* 57 TC 568 (1972), *aff'd,* 472 F2d 590 (6th Cir 1973), 73-1 USTC ¶ 9190, 31 AFTR2d 73-674, and *Field & Co.,* 43 P-H Tax Ct Mem 74-106 (1974), lead this court to conclude that plaintiff's loans to Ramic resulted in nonbusiness bad debts for personal income tax purposes.

Is a similar disposition to be made of the $15,000 loaned by Bank A to Ramic, on plaintiff's guarantee, requiring him finally to pay the principal sum plus $880.82 of interest? As stated above, plaintiff's principal business was as president and executive officer of Sweed. If, as a paid employee of Sweed, he had guaranteed loans to Sweed and had to pay the lender, it would appear that he would have had a business bad

debt deduction because it could be inferred that his salary from Sweed was so greatly in excess of his capital contribution that the preservation of his salary would be his "dominant and primary" motivation, as required by *United States v. Generes, supra.* The guarantee in this suit, however, was not to "Sweed's bank" (Bank B) but on account of Ramic's debt to Bank A. Plaintiff was the chief officer of both corporations. Plaintiff was solvent. He could have been legally compelled to pay on his guarantee respecting Ramic's note to Bank A. Can it be argued that plaintiff would have considered himself as being *further* impelled to do his legal duty to honor his guarantee to Bank A because of his relationship through Sweed to Bank B? Could this required payment on account of Ramic in some way be related to Sweed's line of credit and the preservation of plaintiff's position with Sweed?

This is a hard case, turning on a narrow point, and every consideration has been given to plaintiff's arguments, but they appear to the court to be insufficient. Statutes authorizing tax deductions are strictly construed.

This question appears to be resolved in the case of *French v. United States,* 487 F2d 1246 (1st Cir 1973), 74-1 USTC ¶ 9108, 33 AFTR2d 74-332, *rev'g* USDC (NH 1973), 73-2 USTC ¶ 9505, 32 AFTR2d 73-5467, the facts of which reflect to a degree those in this suit, but with only one lending agency involved. In that case, the owner-employee of two incorporated auto dealerships in different towns in New Hampshire guaranteed loans of one of them to keep that dealership alive. This action was held not to be relevant in protecting his salary in the other corporation. The judge of the U. S. Court of Appeals pointed out that to qualify as a loss under the "business bad debt" provision of IRC (1954), § 166, the taxpayer had to show that it was within the statutory definition, which is stated in the Code thus:

"(2) *Nonbusiness debt defined.*—For purposes of

paragraph (1), the term 'nonbusiness debt' means a debt other than—

"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

■ The court then said (74-1 USTC at 83,027, 33 AFTR2d at 74-333):

"* * * Unless the debt was a business debt when created—a characterization we will answer later— taxpayer's contention must be that since he had to pay the debt to the finance company to maintain his personal credit standing, it is to be regarded as a business debt under subsection B. But in talking about motive for the payment, instead of for the incurrence of the debt, taxpayer is speaking of an event as to which he admittedly had no choice. [The taxpayer had stated in his testimony: "I had to cover it, anyway. I had no choice."] To say that a payment which is unavoidable has a 'dominant [business] motive' and hence is to be regarded as a business debt because of collateral consequences of nonpayment is to confuse substance with tangential result.

"The reality of the situation is that the loss from the worthlessness of the debt was incurred as a result of the act of the defendant in 1961 in undertaking the obligation. The business or nonbusiness quality of the loss was not changed because taxpayer in 1964 decided to fulfill the already vested obligation voluntarily. If taxpayer did not make the guarantee originally as a business obligation, it did not become such by the mere fact that his paying in cash, instead of by distraint of a lawsuit, may have avoided business complications. The fallacy of emphasizing the circumstances of payment instead of those surrounding the incurring of the loss may be illustrated in simple terms by considering an individual whose business success depends on his personal credit rating, and who says that since nonpayment of his personal bills would injure his credit, paying them is a business expense. However attractive, this is not a viable proposition."

In short, at the time of guaranteeing Ramic's loan from the bank, plaintiff's dominant and primary

motivation was to keep Ramic afloat financially. He had no primary reason to fear for his "job" with Sweed. But Ramic was not *his* "trade or business," so his guarantee was a nonbusiness act.

Plaintiff's arguments in this suit suggest that, in his mind, he and Ramic were a single entity. (Although there were two other shareholders, he had created Ramic for his particular program and purpose.) That a corporation, although closely held, is a separate and distinct legal entity apart from its stockholders is a legal fiction which, as a matter of public policy, the courts are bound to uphold. (A great deal of difficulty has been engendered because of the concept of a controlling stockholder-executive officer of what is practically a "corporation sole" to regard "his corporation" as an alter ego. This must not be encouraged by court decisions.)

Some diminution of the corporate legal entity has occurred by the decisions of courts that the activities of an individual rendering services to a corporation in return for wages or a salary may constitute the trade or business of the individual, as illustrated in cases cited in this decision. Plaintiff urges the court to go even further and to recognize, in this suit (in which there is no legal relationship between Sweed and Ramic), plaintiff's desire, in some fashion, to combine his employment with Sweed with his activities in Ramic to convert nonbusiness bad debts into business bad debts. He argued that "Ramic was a conduit." This proposal is answered in the quotation above from the decision in *French, supra,* in which the guaranteed lending agency was the same for both corporations. Plaintiff has presented a weaker case than the plaintiff in *French.*

The court has examined the four decisions cited by plaintiff in support of his argument. It has been unable to find a parallel between the facts in this suit and those in *R. Parks Williams et al. v. United States,* USDC (MD Fla 1963), 64-1 USTC ¶ 9114, 12 AFTR2d 6157. *Oddee Smith,* 55 TC 260 (1970), is a case in

which the trial court felt itself bound, against its own judgment, to follow the test of "significant" rather than "dominant and primary" motivation. The decision was vacated and remanded (457 F2d 797 (5th Cir 1972), 72-1 USTC ¶ 9354, 29 AFTR2d 72-814) in light of the decision in *United States v. Generes, supra* (also cited by plaintiff and followed herein). The effect of *Generes* was acknowledged by the U. S. Tax Court on remand. *Oddee Smith,* 60 TC 316 (1973).

The most significant case offered as authority for plaintiff's position is *James O. Gould,* 64 TC 132 (1975). There the court was convinced that the taxpayer paid some of the debts of defunct corporation B "because of his fear that his failure to clear up the imbroglio might jeopardize his position" with corporation A. Plaintiff's testimony in the present case was not that strong and the burden of proof is upon him. *David Shinefeld,* 65 TC 1092, 1099 (1976); *J. T. Dorminey,* 26 TC 940, 945 (1956).

This court finds, on the preponderance of the evidence, that the predominant motive of plaintiff in his personal loans to Ramic and guarantees of the bank loans was to carry out the program of developing a line of electronic equipment which was compatible with Sweed's product and would produce profits for Ramic. But this, in a legal sense, was the business program of Ramic, not of the plaintiff. Plaintiff chose to create the shield of corporate limited liability rather than to carry on the project as an individual for the benefit of Sweed or to make it part of Sweed's corporate program in 1967, as he could have done. (His initial guarantees for Ramic were made in 1965, his loans in 1964-1965.) His payment on the guarantees was made because he was solvent and had a clear legal liability; he had no choice of "motives." His desire to preserve the credit of Sweed, and thus his "job" with Sweed, by honoring his guarantees on behalf of Sweed, may have been a significant factor but was not the dominant motive.

Defendant's Order No. I 76-20 is affirmed and it is awarded its statutory costs.