LAWRENCE J. DOERFLER and NORMA L. DOERFLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Doerfler v. Commissioner
Docket No. 10859-75.
United States Tax Court
T.C. Memo 1977-193; 1977 Tax Ct. Memo LEXIS 247; 36 T.C.M. (CCH) 789; T.C.M. (RIA) 770193; June 22, 1977, Filed Richard F. McDivitt and Patrick Jon Casey, for the petitioners. Osmun R. Latrobe, for the respondent. TIETJENS
MEMORANDUM OPINION TIETJENS, Judge: Respondent determined the following deficiencies in petitioners' income taxes Year
Deficiency
1969
$14,730.74
1970
15,729.03
The issue is whether a loss arising from the satisfaction of a guarantee qualifies *248 as a business bad debt. The parties have filed a full stipulation of facts which together with the exhibits attached thereto are incorporated by this reference. Petitioners Lawrence J. and Norma L. Doerfler were husband and wife at the time they filed their petition. Their legal residence was 6804 South Country Club Drive, Oklahoma City,Oklahoma. Petitioners timely filed joint income tax returns for the years 1969, 1970, and 1972 with the District Director of Internal Revenue, Austin, Texas. Petitioner (Lawrence J. Doerfler will sometimes be referred to as "petitioner") was born in 1932. After graduating from Oklahoma State University in 1954, he associated with his father in the Doerfler Construction Company until 1961. From 1961 to 1965 he was the franchisor for Tastee-Freez of Western Oklahoma. In 1961 petitioner acquired a "drive-in" restaurant in Chickasha, Oklahoma, and a "sit-down" restaurant in Tahlequah, Oklahoma; he sold both in 1964. In late 1964 and early 1965 petitioner acquired Mr. Swiss of America, Inc. (Mr. Swiss), a chain of drive-in restaurants. He acquired his stock in Mr. Swiss pursuant to an exemption under section 4(2) of the Securities Act of *249 1933 as amended. Mr. Swiss furnished the equipment and trained, organized, controlled and managed the operations through franchisees. The franchisees leased the land and buildings from third parties. Mr. Swiss did not construct or own any of the outlets.
Petitioner was president and chief executive officer of Mr. Swiss during its entire corporate existence. On May 21, 1965, petitioners executed a guarantee to Liberty National Bank and Trust Company of Oklahoma City, Oklahoma (Liberty). This guarantee made petitioners primarily and directly liable on all loans extended by Liberty to Mr. Swiss. The guarantee was "unlimited" as to amount of liability. Mr. Swiss subsequently entered into several promissory notes and/or loans with the Liberty National Bank. In a memorandum dated July 17, 1969 concerning a loan application by Mr. Swiss, Mr. Joe Semrod, a loan officer with Liberty, stated that the bank "should require the unlimited guaranty of Mr. and Mrs. Doerfler." He concluded the memorandum with this statement: The line of credit to this company must be considered as remaining somewhat speculative due to the fact that quite often the obligors on the conditional sales *250 contracts are far removed from the Oklahoma City area. Despite this, however, the fact that the company has improved its balance sheet to the point where its worth exceeds total debt, when coupled with the fact that they retained earnings in excess of $200,000 during the past year, seems to make this credit request a reasonable one. On July 23, 1969, petitioners executed a second guarantee to Liberty National Bank. This guarantee made petitioners primarily and directly liable on all loans extended by Liberty to Mr. Swiss. The guarantee was "unlimited" as to amount of liability. Petitioner's income for 1967, 1968 and 1969 is as follows: 1967
1968
1969
Mr. Swiss
$22,895.00
$48,405.00
$50,500.00
Other
13,213.87
5,915.40
9,444.00
On July 14, 1971, Dun & Bradstreet, Inc. published an Analytical Report on Mr. Swiss. The report listed figures for net working capital, net worth, fixed assets, deferred notes receivable, long-term debt, sales and profit. It included balance sheets for fiscal periods ending March 31, 1968, March 31, 1969, and March 31, 1970. The report stated that during the fiscal period ending March 31, 1969, Mr. Swiss made *251 a public offering of its stock for which the company received approximately $1,172,800 of which $80,000 went to the capital account and $1,092,800 went to the capital surplus account. From the report's statement that the par value of the common stock of Mr. Swiss was $.50 per share it appears that the total number of shares sold to the public was 160,000. Apparently the price per share was $7.33. Approximately 880,000 shares were outstanding in July 1969; of these petitioner owned 80 percent or 704,000 shares. Mr. Wayne Von Feldt, Manager of the Oklahoma City Branch of Stifel Nicolaus & Co., Inc. ascertained the price for which common stock of Mr. Swiss sold. He supplied the following information: 7/25/69
bid
11
ask
12
12/31/70
bid
1/8
ask
5/8
4/2/71
bid
2
ask
2-3/8 Stifel Nicolaus did not have information on the actual stock sold or the number of shares sold, if any. At about the time of the July 23, 1969 guarantee, Mr. Swiss began the acquisition of certain companies which became wholly-owned subsidiaries. They were: (a) Dutch Boy of America, Inc., Oklahoma City, chartered June 27, 1969; franchisor of automatic car washes. *252 (b) United Investment Corporation, Oklahoma City, chartered May 27, 1969; manufacturer of car wash equipment and holder of controlling interest in Lustre Bright Corporation, a manufacturer of detergents and waxes. (c) North America Computer Association, Inc., Oklahoma City, chartered January 13, 1970; operator of a data processing service. (d) American Bankers Credit Corporation, Oklahoma City, chartered April 16, 1969; handled financing for the parent corporation and was active in consumer financing and equipment leasing. (e) Heritage Investment Corporation, Sarasota, Florida, chartered November 1969 and purchased by Mr. Swiss March 1970; operator of retail art galleries. On February 18, 1971, Mr. Swiss and Liberty National Bank entered into a loan agreement providing for a loan in the amount of approximately $935,374. Approximately $780,374 was a consolidation of preexisting loans with Liberty and $155,000 was an additional advance. The term of the loan was 180 days. The collateral for the loan consisted of certain property belonging to Mr. Swiss and the guarantee executed by petitioners on July 23, 1969, collateralized by certain property belonging to petitioners. *253 Pursuant to the provisions of the loan agreement, on February 18, 1971, petitioner executed a document entitled "Security-Collateral Agreement" providing for a security interest in certain shares of stock in Mr. Swiss. On April 23, 1971, Mr. Swiss of America, Inc., merged into First World Corporation. In exchange for petitioner's 80 percent stock interest in Mr. Swiss he received 372,500 shares of Class A common voting stock in First World Corporation. In April of 1971 petitioner and Liberty amended the Security-Collateral Agreement for the purpose of exchanging shares of First World Corporation for those of Mr. Swiss. Petitioner moved to New York City following the merger of Mr. Swiss into First World Corporation and became president of First World Corporation. After approximately 4 months, petitioner resigned and returned to Oklahoma City. In calendar year 1972, Liberty National Bank foreclosed on the loan dated February 18, 1971, and seized and sold or took ownership of all of the personal assets pledged by petitioner in that loan agreement as collateral for the guarantee executed in 1969. The parties agree that in 1972 when Liberty foreclosed on the loan petitioner *254 sustained a loss in the amount of $113,421.72 on the worthlessness of a debt. Putnam v. Commissioner,352 U.S. 82 (1956). Petitioner contends that this loss was proximately related to his trade or business and that he could deduct the loss in full. Section 166(a)(1), I.R.C. 1954. [1]Whipple v. Commissioner,373 U.S. 193 (1963). We can sustain petitioner's contention only if his dominant motivation in signing the guarantee which occasioned the loss was to insure that he would continue to derive a salary from his employment as chief executive officer of Mr. Swiss. United States v. Generes,405 U.S. 93, 104 (1972); Millsap v. Commissioner,46 T.C. 751, 754, n. 3 (1966), affd. 387 F.2d 420 (8th Cir. 1968). *255 Respondent determined that petitioner signed the 1969 guarantee to protect his investment in Mr. Swiss and that the resulting loss was deductible only as a short-term capital loss. Whipple v. Commissioner,supra;Loventhal v. United States,346 F. Supp. 1318, 1323 (M.D. Tenn. 1972), affd. per curiam 478 F.2d 311 (6th Cir. 1973); section 166(d)(1). [2]
The issue is one of fact. Smith v. Commissioner,60 T.C. 316 (1973). The burden of proof is on petitioner. Hogue v. Commissioner,459 F.2d 932, 937 (10th Cir. 1972), affirming a Memorandum Opinion of this Court. The law is that *256 the dominant motivation of the individual at the time he signs the guarantee is determinative as to the issue of business or nonbusiness debts. E.g., United States v. Generes,supra;Shinefeld v. Commissioner,65 T.C. 1092 (1976). It is not enough that there be a significant business-related motivation, nor that there be an equally balanced dual relationship. Smith v. Commissioner,supra.The courts in determining an individual's motivation look to the objective and demonstrable facts. United States v. Generes,supra;Kelson v. United States,503 F.2d 1291 (10th Cir. 1972). The first disagreement between the parties is the date to which the Court should look in ascertaining petitioner's dominant motivation. Petitioner argues that the Court should consider his dominant motivation at the time he entered into the loan agreement and the collateral agreements in early 1971. Respondent asserts that petitioner's dominant motivation when he entered into the guarantee agreement in 1969 is determinative. The law is clear as to which date the Court should consider, as correctly stated by petitioners *257 in their opening brief: If the debt bears a proximate relationship to a trade or business of the taxpayer at the time of signing the indemnity and guarantee agreements, it qualifies as a business bad debt. [citations omitted] Petitioner signed the guarantee on July 23, 1969. The rationale for using this date is quite obvious. It is at this time that petitioner committed his assets to backing the corporate debt. Petitioner's liability on the guarantee covered all debts of the corporation to Liberty National Bank, present and future, without any limitation on liability. He did not restrict the assets which the bank could use to satisfy such obligation, nor did the corporation have to default on the loans, since petitioner had agreed to become a primary obligor. Furthermore, it was this obligation that was the basis of the bank's action to satisfy the corporate default. While it is true that it was the corporation's default on the 1971 loan (primarily a consolidation of various loans made in previous years) which caused the bank to demand satisfaction of the personal guarantee, petitioner's obligation originated not in the loan but in the guarantee. Petitioner committed *258 his assets to the loans prior to 1971. If Liberty had gone to judgment on the guarantee without the specific collateral agreements, such assets would still have been subject to attachment. The true impact of the loan agreement and the collateral agreements as to petitioner was not to increase his liability, but was to make his assets more accessible to collection. The bank was not interested in increasing petitioner's liability (which was already unlimited) but in gaining a security interest in his assets to protect his guarantee against third party creditors. Petitioner argues in the alternative that the Court should examine his dominant motivation at the time he signed the 1965 guarantee. He states that this was the guarantee in effect in 1971 because the language in the agreement stated that it was "continuous." Despite the language in the 1965 guarantee agreement we conclude that petitioner's dominant motivation at the time he signed the 1969 agreement is the determining factor in this case. Petitioner signed the 1969 guarantee at the request of the bank and in order to assure approval of further loan applications. Furthermore, we note that in the 1971 loan agreement petitioner *259 agreed to collateralize the 1969 guarantee. There was no mention of the 1965 guarantee agreement.
As for petitioner's dominant motivation at the time he signed the 1969 agreement we note that the Supreme Court in United States v. Generes,405 U.S. 93 (1972), espoused the principle of looking at the objective facts in determining motivation. In that case the Court made a mathematical determination comparing the risks assumed by the taxpayer as guarantor against his potential gains. In this case the risk assumed by petitioner is readily determinable. In the 1969 guarantee, petitioner agreed to accept liability on all debts between Mr. Swiss and the Liberty National Bank. The extent of such potential liability was "unlimited." Between the signing of the guarantee and mid-1972 when Mr. Swiss collapsed, Mr. Swiss borrowed significant amounts of money from Liberty and shortly before its collapse had an outstanding debt to Liberty in excess of $950,000. As for gain from salary, in 1967 petitioner received pre-tax income (salaries and commissions) from Mr. Swiss of approximately $23,000. In 1968 his income from Mr. Swiss was approximately $48,400 and in 1969 was *260 approximately $50,500. He also received an average of approximately $9,000 per year in income from other sources. His after-tax income from Mr. Swiss in 1968 and 1969 would have been approximately $36,545 and $38,127, respectively (using a 24 percent average tax rate). The parties dispute the remaining factor, the value of petitioner's investment. Petitioner contends that his initial investment is the amount we should compare to his annual salary. Respondent counters with the assertion that any comparison between petitioner's salary and his investment should be made on the basis of the investment's value at the time he signed the guarantee. In the first place, there is no evidence in the record as to petitioner's original investment. In the second place, where the contemporaneous market value of the taxpayer's investment can be determined or approximated, then that figure should be used. See, United States v. Generes,supra;Field & Co. v. Commissioner,T.C. Memo. 1974-25; and Young v. Commissioner,T.C. Memo. 1974-76. Respondent in making his analysis of the value of the investment at the time petitioner signed the *261 1969 guarantee relied on a report made by Dun & Bradstreet, Inc. on Mr. Swiss of America, Inc. Petitioners contend that they merely stipulated that Dun & Bradstreet published such a report and that they do not accept such a report as "being factual or evidentiary." The report contains the only information in the parties' stipulation as to the value of the corporation. We will rely on it because petitioners have offered us no other evidence as to the value of the investment. Immediately prior to the signing of the guarantee the corporation had available cash in the amount of $1,587,102; it had a net working capital of $2,018,797; a current ratio of 4.44; and a tangible net worth of $1,768,964. In short, its financial condition was strong. At about that time, Mr. Swiss began a program of internal and external expansion, during which it acquired five wholly-owned corporate subsidiaries. As the Court stated in Mann v. Commissioner,T.C. Memo. 1975-74, in considering the conceptually similar fact situation in Gillespie v. Commissioner,54 T.C. 1025 (1970), affd. per curiam in an unreported order (9th Cir. 1972), 30 AFTR 2d 72-5574, 72-2 USTC par. 9742: *262 The taxpayer in Gillespie, together with other shareholders, adopted a policy to guarantee funds for a number of corporate acquisitions and to provide long-term working capital as a regular and continuous means of financing - a function usually accomplished by equity capital.* * * The extent of such activities and the nature of the transactions were too closely related to the investment motive to be for the dominant purpose of protecting employment. * * * Although in Mann the Court did not find the situation similar to Gillespie, in the present case the facts are analogous and the above reasoning appropriate. These facts show that at the time petitioner signed the guarantee, the financial situation of the corporation was strong. It possessed large amounts of cash, and petitioner directed it with an eye toward expansion rather than survival. We discern that at that time petitioner had no real reason to feel fearful of losing his job. Instead he had a very strong incentive to protect and enhance his investment in the corporation. On the date that petitioner signed the 1969 guarantee, he owned approximately 704,000 of the 880,000 outstanding shares of Mr. Swiss. *263 During the period ending March 31, 1969, just prior to the guarantee, Mr. Swiss had made a public offering of its shares, at which time it sold 160,000 shares and netted $1,172,800 in new capital. The average price of such stock was, therefore, $7.33 per share (plus the underwriter's markup). Quotations obtained from Stifel Nicolaus and Company, Inc., a stock brokerage firm, show that the bid price of the stock on July 25, 1969, was $11 per share with the asked price being $12 per share. Assuming the lowest of these values ($7.33 per share), the value of petitioner's investment in Mr. Swiss of America, Inc., would have approached $5,200,000. [3] Such was the figure which would have been in petitioner's mind when asked to sign the guarantee for the loans to Mr. Swiss. Considering the potential liability that the petitioner assumed (approaching $1,000,000) and the current value of petitioner's stock at the time he signed the guarantee, it is apparent that his dominant motivation in *264 signing the guarantee was to protect his investment. Decision will be entered for the respondent. Footnotes
1. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
2. Sec. 166(d) Nonbusiness Debts-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than six months. [Congress amended section 166(d)(1)↩ Oct. 4, 1976, section 1402(b)(1)(A) of Public Law 94-455.]
3. We take note of the fact that petitioner owned approximately 80 percent of the stock and that he held it pursuant to an exemption under section 4(2) of the Securities Act of 1933 as amended.↩