Argued December 8, 1977, affirmed May 2, 1978

# JEDDELOH et ux, *Appellants,*
## *v.*
# DEPARTMENT OF REVENUE, *Respondent.*
## (TC 1074, SC 25172)
### 578 P2d 1233

James C. Griggs and Daniel A. Ritter, Salem, argued the cause and filed briefs for appellants.

James D. Manary, Assistant Attorney General, Salem, argued the cause and submitted a brief for respondent. With him on the brief was James A. Redden, Attorney General, Salem.

Before Denecke, Chief Justice, Holman and Lent, Justices, and Richardson, Justice Pro Tempore.

LENT, J.

**LENT, J.**

This case involves an appeal by the plaintiff-taxpayer[1] from an adverse decision by the Tax Court. *Jeddeloh v. Dept. of Rev.,* 7 OTR 49 (1977). Certain of the taxpayer's debts became worthless in 1973 and were claimed as a business bad debt loss deduction on the taxpayer's 1973 Oregon Personal Income Tax Return. The Department of Revenue (Department) disallowed the deduction of the full amount of the bad debt loss, claimed that the loss was a non-business bad debt and entitled only to short-term capital loss treatment, and allowed a deduction only to the extent of capital gain plus up to $1,000 of ordinary income. The taxpayer unsuccessfully appealed this ruling to the Tax Court. The "sole" issue as framed by the parties in their stipulation and iterated by the Tax Court is whether the loss realized by the taxpayer from the worthlessness of the debts in question emanated from a business or a non-business bad debt as defined by IRC Sec. 166(d)(2). We find that it was a non-business bad debt and affirm.

■ The question of whether a debt is a business or non-business debt is peculiarly a question of fact governed by the evidence developed in each particular case. For reasons which will become apparent, we emphasize the burden of proof and scope of review applicable to this case. ORS 305.427 provides:

> "In all proceedings before the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."

ORS 305.445 provides:

> "The sole and exclusive remedy for review of any decision or order of the tax court shall be by appeal to

---

[1] The plaintiffs in this case are Fred Jeddeloh and Louise C. Jeddeloh, by virtue of the joint return. Hereinafter reference to the taxpayer will be to Fred Jeddeloh.

the Supreme Court. Jurisdiction hereby is vested in the Supreme Court to hear and determine all appeals from final decisions and final orders of the tax court, except with respect to the small claims division of the tax court. Such appeals, and the review of final decisions and final orders of the tax court, shall be in accordance with the procedure in equity cases on appeal from a circuit court, but without regard to the sum involved. Upon such appeal and review, the Supreme Court shall have power to affirm, modify or reverse the order or decision of the tax court appealed from, with or without remanding the case for further hearing, as justice may require."

■■ Accordingly, we review de novo on the record. ORS 19.125(3). While we are not bound by the Tax Court's findings of fact, they are entitled to "great weight" upon review. *Reynolds Metals v. Dept. of Rev.,* 258 Or 116, 119, 477 P2d 888, 481 P2d 352 (1971). This is especially true in matters of the credibility of witnesses. *Norman v. Jerich Corporation,* 263 Or 259, 265, 501 P2d 305 (1972). The evidence in the present case consisted entirely of the taxpayer's testimony and that of the comptroller of the taxpayer's employer, Jeddeloh Brothers Sweed Mills, Inc. (Sweed). The Department called no witnesses.

The parties made the following stipulation below:
"* * * Fred Jeddeloh, hereinafter referred to as 'taxpayer,' is President and major stockholder of Jeddeloh Brothers Sweed Mills, Inc., a corporation engaged in the manufacturing and distribution of lumber and plywood handling equipment. Taxpayer's trade or business is that of officer and manager of Jeddeloh Brothers Sweed Mills, Inc. On or about 1964, taxpayer and two others formed Ramic Corporation. At this time, taxpayer owned 90 percent of the outstanding stock of Ramic Corporation. Subsequently, taxpayer's 90 percent stock ownership was reduced, first to 80 percent, and finally to 40 percent. Taxpayer made certain loans to, and guaranteed certain loans of, Ramic Corporation. In 1973 these debts in the amount of $75,210.42 owed to the taxpayer by Ramic Corporation became totally worthless when said corporation was voluntarily dissolved. * * *"

In addition, we find that the record in this case establishes the following facts:

In 1956 the taxpayer and one of his brothers incorporated Jeddeloh Brothers Sweed Mills, Inc., with its sole place of business at Gold Hill, Oregon. The taxpayer made a $20,000 capital investment, held 50% interest in Sweed, and was appointed its president at a salary of $12,000 per year (1960).

In 1963 Sweed purchased an unrelated manufacturing operation in Independence, Oregon, at which time another of plaintiff's brothers entered the business and the taxpayer's stock ownership dropped from 50% to 20%. Thereafter, the taxpayer actively managed the Gold Hill operation, while his two brothers supervised the Independence plant. At this time (1963) the taxpayer's salary was $24,000 a year.

Soon after the purchase of the Independence operation, the brothers disagreed on the allocation of research and development funds between the two plants. The taxpayer favored the development of electronic control devices to complement the wood handling equipment manufactured at the Gold Hill location, while others on the five-member board of directors favored allocation of research and development funds exclusively to the Independence operation. The latter faction prevailed, and the taxpayer determined that the Gold Hill operation was "stagnant" and that he had to go out on his own.

In 1964, the taxpayer incorporated Ramic Corporation (Ramic) to develop the electronic technology he felt was needed at the Gold Hill plant. The taxpayer served as president of Ramic without salary. The taxpayer's initial investment was $20,000 for a 90% interest, but soon thereafter it rose to $50,000 capital investment. Later, in 1964 and 1965, the taxpayer sold a portion of his stock to Alfred and Dunbar Carpenter, other relatives, at no profit, reducing taxpayer's interest to 40%. At this time (1965) the taxpayer's salary as president of Sweed rose to approximately $34,000 a year.

In 1964 and 1965 the taxpayer made direct loans to Ramic totaling $66,500. During 1965, Alfred and Dunbar Carpenter loaned Ramic approximately $200,000. In addition, in 1965 the taxpayer guaranteed a loan to Ramic from the First National Bank of Medford for $15,000. Ramic also borrowed money from the U.S. National Bank of Medford, the bank which extended Sweed an unsecured line of credit varying from $70,000 to $300,000 during the period in question. There is no evidence that the taxpayer guaranteed the loans to Ramic from the U.S. National Bank of Medford.

In 1964 and 1965 Ramic developed various electronic control systems for use on equipment manufactured by Sweed. Ramic sold its products and designs almost exclusively to Sweed; however, in at least one instance Ramic sold an electronic "plywood defect scanner" directly to a wood products manufacturer without Sweed's participation.

In 1967 Sweed's Independence operation was spun off to one of the taxpayer's brothers (while the other brother went "independent"), and the taxpayer was left with a 70% interest in Sweed. In 1969 and in 1972 the taxpayer renewed his direct loans to Ramic. In February 1973 Ramic, which had never had a profitable year, became insolvent and was voluntarily dissolved. In 1973 the taxpayer paid the First National Bank of Medford $15,880.82 ($15,000 in principal and $880.82 in interest) on his guaranty. Upon Ramic's liquidation, the taxpayer realized $7,170.40 on the $66,500 outstanding debt, for a loss of $59,329.60. The taxpayer claimed $75,210.42 as a business debt loss deduction under IRC Sec. 166(d) on his 1973 Oregon Person Income Tax Return.

The Oregon Personal Income Tax Act (ORS ch 316), as passed in 1969, is based on the Internal Revenue Code of 1954 except as specifically provided otherwise. ORS 316.007; *Christian v. Dept. of Rev.,* 269 Or 469, 472, 526 P2d 538 (1974). IRC Sec. 166 provides, in pertinent part:

"SEC. 166. BAD DEBTS.

"(a) General Rule.—

"(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

"\* \* \* \* \*

"(d) Nonbusiness Debts.—

"(1) General Rule.—In the case of a taxpayer other than a corporation—

"(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

"(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

"(2) Nonbusiness Debt Defined.—For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—

"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

The taxpayer is not a corporation; therefore, the distinction drawn in IRC Sec. 166(d)(2) is critical. Since its enactment,[2] this distinction has created much

---

[2]The legislative history of this section is pertinent to the present case and is reviewed in the concurring opinion of Marshall, J., in *US v. Generes,* 405 US 93, 109-110 (1972). IRC (1939) § 23(k) and its predecessors made no distinction between business and nonbusiness bad debts. In 1942, § 23(k) was amended to draw the distinction which remains essentially the same in the 1954 Code. Justice Marshall continues:

"The major congressional purpose in distinguishing between business and nonbusiness bad debts was to prevent a taxpayer from lending money to friends or relatives who they knew would not repay it and then deducting against ordinary income a loss in the amount of the loan. \* \* \* H.R. Rep. No. 2333, 77th Congress, Second Session, 45, 76-77; S. Rep. No. 1631, 77th Congress, Second Session 90.

"A related congressional purpose in enacting the predecessor to Section 166 was 'to put nonbusiness investments in the form of loans on a footing with other nonbusiness investments.' *Putnam v. Commissioner,* 352 US 82, 92 (1956). Congress recognized that there often is

controversy. Treasury Regulation § 1.166-5(b) sought to shed light on the distinction by indicating that the relationship between the debt and the taxpayer's trade or business must be a "proximate" one for the debt to receive business bad debt treatment. The use of this term, so identified with tort causation, led many courts to conclude that the debt need only bear a "significant" relationship to the taxpayer's trade or business—or, better stated, that the taxpayer's trade or business provided a significant motivation for the creation or acquisition of the debt or the incurrence of a loss therefrom. *See, e.g., United States v. Generes,* 427 F2d 279 (5th Cir 1970); *Weddle v. Commissioner,* 325 F2d 849 (2d Cir 1963). Other courts determined that the taxpayer's trade or business motivation must be the dominant or primary motivation. *See, e.g., Niblock v. Commissioner,* 417 F2d 1185 (7th Cir 1969). The conflict was finally resolved in *United States v. Generes,* 405 US 93 (1972), where the U.S. Supreme Court chose the latter test in a case whose facts typify those in which this issue is presented and parallel those of the present case with one twist. There, the taxpayer incorporated a family-owned construction business with a capital investment of $38,900 and a 44% interest. The taxpayer served as president of the corporation with a salary of $12,000 a year. (The taxpayer's gross income during this period was $40,000 a year.) The taxpayer signed an indemnity agreement with the corporation's surety agreeing to indemnify the surety from any loss it incurred as a result of a default of the corporation. In 1962 the corporation underbid two projects, defaulted, and the

---

only a minor difference, if any, between an investment in the form of a stock purchase and one in the form of a loan to a corporation. See, e.g., *Kelley Company v. Commissioner,* 326 US 521 (1946); *Bowersock Mills and Power Company v. Commissioner,* 172 F2d 904 (CA 10 1949).

"It is apparent that Congress was especially concerned about the possibility that closely held family businesses might exploit the technical differences among the forms in which investments can be cast in order to gain unwarranted deductions against ordinary income." 405 US at 110.

surety was called upon to complete the work. The taxpayer paid the surety approximately $162,000 pursuant to the indemnity agreement. In the same year the taxpayer loaned the corporation approximately $159,000. The corporation went into receivership, and the taxpayer incurred a loss. The taxpayer claimed he had acquired the debt and incurred the loss in his trade or business. The trial court instructed the jury on the significant motivation test and a verdict was returned for the taxpayer. The Court of Appeals affirmed, and the U.S. Supreme Court reversed.[3]

■ The reversal was based on the trial court's error in applying the "significant motivation" test. The Supreme Court held that the proper test as to whether the bad debt had a "proximate" relation to the taxpayer's trade or business was the "dominant motivation" test. The reasons given for this choice are so cogent that this court, while not absolutely bound in a case arising under Oregon law to accept it, does not hesitate to adopt it here. The first reason given was to preserve the distinction which, as the legislative history indicated, the statute was intended to draw.[4] Secondly, the significant motivation test would tend to undermine the further distinction drawn in *Whipple v. Commissioner,* 373 US 193 (1963), between the taxpayer's role as an employe, a trade or business interest, and his role as an investor, not a trade or business interest. Thirdly, the dominant motivation test is more workable and provides a more certain guideline to the trier of fact. Since, in a typical case, at least two motivations are involved, the trier of fact may compare them with each other to determine which, if any,

---

[3]The Supreme Court reversed and granted judgment n.o.v. for the United States rather than a new trial, stating that in its review of the record of this case, it had determined that there was not sufficient evidence for the jury to find that the taxpayer's dominant motivation related to his trade or business. It should be noted that we do not make this same determination here, but merely hold that in our de novo review the taxpayer did not sustain his burden of proving that his dominant motivation related to his trade or business.

[4]*See* footnote 2, *supra.*

is the dominant one. In the words of the Supreme Court, "the trier then may compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." *Id.* at 104.

The dominant motivation test reinforces the mandate of IRC Sec. 262, excluding deductions for personal, living or family expenses except as specifically provided. It also provides for an approach consistent with that approved for IRC Sec. 165(c), Losses to Individuals. *See, e.g., Imbesi v. Commissioner,* 361 F2d 640, 644 (3d Cir 1966); *Austin v. Commissioner,* 298 F2d 583, 584 (2d Cir 1962); Treasury Regulation Sec. 1.166-5(b).

The Tax Court applied the dominant motivation test in the present case and found that the taxpayer had not carried his burden of persuasion that his dominant motivation was in fact related to his trade or business—that of being an employe of Sweed. While the taxpayer repeatedly testified to the contrary, we note the Supreme Court's persuasive analysis that "proper emphasis [be given] to the objective rather than to the subjective." At the time the taxpayer made the direct loans to Ramic and guaranteed the bank loans, there were at least four identifiable motives which may have impelled the taxpayer: (1) to protect the taxpayer's job at Sweed and increase his salary; (2) to protect his investment in Ramic and increase his rate of return therefrom; (3) to protect his investment in Sweed and increase his rate of return therefrom; and (4) to protect his prior loans to Ramic and to realize interest income therefrom. The first motivation involves a trade or business interest, and if the taxpayer proves it was the dominant motivation, he is entitled to a business debt deduction. The latter three are not trade or business interests.

■ As noted by the Tax Court, had the loans and guaranties been made to and for Sweed, the taxpayer's employer, the burden of proving that the dominant motivation was to protect the taxpayer's job and salary

would have been much easier. However, since the loans and guaranties were made to and for a corporation legally unrelated to the taxpayer's employment, the taxpayer is faced with the additional burden of showing that Ramic's existence and success were related to Sweed's continued existence and success. The opinion of the Tax Court ably reviews the few reported cases which involve the two-corporation situation of the present case. Suffice it to say, there is no support for the taxpayer's position to be found there.

■ The taxpayer argues that, at least insofar as the bank guaranties are concerned, this court must look at the taxpayer's dominant motivation, not only at the time the guaranties were made, but also at the time the guaranties were honored (in 1973).

The taxpayer argues that the dominant motivation for honoring the guaranties was to protect the taxpayer's personal credit rating, which in turn would protect Sweed's line of credit, which then in turn would protect the taxpayer's job and salary, since without the line of credit Sweed could not continue in business. This argument falls of its own weight. First of all, it was not to Sweed's bank that Ramic owed the debt which the taxpayer guaranteed but to another bank. Secondly, the taxpayer's reasoning applies equally as well to a dominant motivation to protect the taxpayer's investment interest in Sweed, which was a 70% interest at that time. The taxpayer's salary at this time was approximately $38,000 a year. The third reason that the taxpayer's argument is not persuasive is that the taxpayer was legally bound to honor his guaranties. While his honoring of them may have had the collateral effect of avoiding a credit crisis, the result of which may have threatened the taxpayer's trade or business, where the law imposes a duty on a person and that person fulfills it, there is a strong inference that compliance with that legal duty was his dominant motivation. This taxpayer's testimony of his subjective motivation, as factually tenuous as it is,

[ 301 ]

does not overcome this inference. *See French v. US,* 487 F2d 1246, 1248 (1st Cir 1973).

The decree of the Tax Court is affirmed.