MARK O. THOMPSON and LINDA H. THOMPSON, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Thompson v. Commissioner
Docket Nos. 5947-75, 5948-75, 5949-75.
United States Tax Court
T.C. Memo 1977-35; 1977 Tax Ct. Memo LEXIS 406; 36 T.C.M. (CCH) 157; T.C.M. (RIA) 770035; February 14, 1977, Filed James David Leckrone, for the petitioners. John B. Harper, *407 for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies and addition to tax in petitioners' Federal income taxes: Addition to Tax
(Sec. 6653(a),
Docket No.
Year
Deficiency
I.R.C. 1954)
5947-75
1972
$ 1,841.58
0
1973
14,563.18
$ 728.16
5948-75
1969
1,810.75
0
5949-75
1969
1,810.75
0
The only issue remaining for decision [2] is whether, for purposes of section 1374(c)(2), [3] certain bank loans made directly to an electing small business corporation and guaranteed by petitioner Mark O. Thompson should be treated as amounts advanced by him and thus an indebtedness owed to him by the corporation. *408 FINDINGS OF FACT Petitioners Mark O. and Linda H. Thompson, husband and wife, were legal residents of Nashville, Tennessee, on the date their petition was filed in docket No. 5947-75. They filed joint Federal income tax returns for 1972 and 1973. Petitioner Alicia B. Thompson was a legal resident of Nashville, Tennessee, at the time her petition was filed in docket No. 5949-75. During 1969 she was the wife of petitioner Mark O. Thompson, who was a legal resident of Nashville, Tennessee, also at the time his petition was filed in docket No. 5948-75, and they filed a joint Federal income tax return and an amended return for that taxable year. Hundred Oaks Music Center, Inc. [4] (hereinafter referred to as 100 Oaks or sometimes the corporation), a Tennessee corporation, was incorporated on October 2, 1963. Its original name was Hammond Organ Studios of Nashville, Inc., and its initial paid-in capital was $25,000. The principal business of 100 Oaks is and has been the sale of pianos and organs. During the years in issue, petitioner Mark O. Thompson (hereinafter petitioner) owned 200 shares (80 percent) of the outstanding common stock of the corporation and H.A. Thompson, *409 Jr., owned the remaining 50 shares (20 percent). The shareholders of 100 Oaks made an election at the time of its incorporation to report the corporation's income as a small business corporation pursuant to the provisions of section 1372. During the fiscal years ended September 30, 1967, through September 30, 1972, 100 Oaks had gross receipts ranging from $413,386.79 to $343,700.50 and reported the following amounts of taxable income (or loss) which were allocated to its shareholders: Fiscal Year
Shareholders Ended
Mark O. Thompson
H. A. Thompson, Jr.
Sept. 30, 1967
$ 4,676.55
$ 1,305.08
Sept. 30, 1968
( 9,673.82)
( 2,418.46)
Sept. 30, 1969
(11,207.32)
( 2,801.83)
Sept. 30, 1970
16,665.25
4,166.31
Sept. 30, 1971
(28,512.18)
( 7,128.04)
Sept. 30, 1972
(51,517.98)
(12,879.50)
On October 1, 1968, 100 Oaks had no "undistributed taxable income" as defined in section 1373(c). On that date petitioner's basis in his 100 Oaks stock was $20,000, and he had an additional basis of $14,729.23 by reason of a debt *410 owed to him by the corporation. During the years pertinent to this case, petitioner loaned to, and was repaid by, 100 Oaks certain amounts as follows: Fiscal Year Ended
Borrowed
Repaid
Sept. 30, 1969
$ 3,000.00
$ 5,500.00
Sept. 30, 1970
16,000.00
7,500.00
Sept. 30, 1971
42,500.00
10,500.00
Sept. 30, 1972
4,500.00
16,116.61
Sept. 30, 1973
0
22,888.43
During these same fiscal years, 100 Oaks made no distributions to stockholders other than salaries and loan repayments. During 1968 Commerce Union Bank, Nashville, Tennessee (hereinafter Union Bank or bank), began lending money to 100 Oaks on a series of renewable notes.Prior to 1972 Union Bank had no definite arrangement with 100 Oaks regarding collateral for the loans. Substantially all the promissory notes evidencing such loans stated they were secured by the "financial statement" of either 100 Oaks or petitioner and by the "personal endorsement" of petitioner and were in fact endorsed by petitioner. On April 3, 1972, under a loan agreement executed by Union Bank and by 100 Oaks, the bank agreed to extend credit to 100 Oaks in an amount not exceeding $132,000. The loan agreement provided *411 for the consolidation of a then existing debt of $61,000 owed the bank by 100 Oaks, a $13,500 debt owed the bank by petitioner, and a $7,000 debt owed the bank by Music Mart, Inc. (a corporation not involved in the present controversy), together with an advance to 100 Oaks of $50,500 in "new money." The execution of a $132,000 note covering all of these debts was called for under the loan agreement, but said agreement provided that: "At no time shall the outstanding principal balance of all indebtedness owed by * * * [100 Oaks] to Bank exceed Ninety (90%) percent of inventory and accounts receivable." Sirloin Enterprises, Inc. (a corporation also not involved in the present controversy), signed the loan agreement to evidence its assent to certain subordination provisions, and petitioner joined in the "execution of this instrument for the purpose of evidencing his agreement to be bound by the provisions affecting him." Pursuant to a security agreement executed by Union Bank and by 100 Oaks and petitioner on April 17, 1972, 100 Oaks assigned to the bank a security interest in all its inventory and accounts receivable as collateral for all indebtedness incurred under the loan agreement. *412 As further security for such indebtedness, petitioner assigned all the rental income due him from certain leases in which he had an interest; all income disbursements and dividends due him from a third-party corporation; and a $100,000 life insurance policy on his life. Petitioner agreed that he would not transfer any of this property without the consent of the bank or allow it to become encumbered. In the loan agreement, 100 Oaks agreed that it would (1) furnish to the bank monthly financial statements and inventory lists; (2) grant the bank the right of first refusal on all retail sales contracts entered into by 100 Oaks; (3) refrain from incurring any indebtedness other than its indebtedness to petitioner, which was to be subordinated to the indebtedness of 100 Oaks to the bank; (4) pay no dividends while the indebtedness was outstanding; and (5) limit salaries and bonuses for 1972 to $15,000 for petitioner and $5,000 for H. A. Thompson, Jr., subject to annual increases not in excess of 10 percent in subsequent years. A financing statement was filed by Union Bank with the Tennessee Secretary of State on April 24, 1972, showing 100 Oaks as the debtor and indicating accounts *413 receivable, contract rights, and inventory as collateral. On May 3, 1972, 100 Oaks signed a note for $99,000 to Union Bank, the first note made following the execution of the loan agreement. Thereafter, 100 Oaks gave renewals of the notes about every 30 days, reflecting its outstanding indebtedness to the bank at the time the note was executed. Petitioner endorsed all the notes, as required by the loan agreement. Without regard to the loan agreement, it was the bank's policy to obtain such endorsements when loans were made to small corporations. By September 7, 1972, 100 Oaks' debt to the bank had risen to $124,000. Thereafter the indebtedness declined; by September 5, 1973, 100 Oaks owed $116,000; by September 6, 1974, $103,500; and by the 5th of September 1975, the last month of 100 Oaks' corporate existence, $91,000. These loans were carried on the bank's records as loans to 100 Oaks and on 100 Oaks' records as loans payable to the bank. On December 6, 1974, 100 Oaks made a renewal note for $100,000, payable to Union Bank. This note was one of the series of notes made by 100 Oaks during the years pertinent to the issue in this case. The loan proceeds under this note *414 were issued by check to petitioner "For 100 Oaks Music Center" on December 13, 1974, which he deposited in his personal bank account on that same date. He then wrote a $100,000 personal check on his account, payable to 100 Oaks, which was deposited in the corporation's bank account. Also on December 13, 1974, 100 Oaks issued a check to petitioner for $101,500. On the same date, petitioner deposited this check in his personal bank account and wrote a personal check for the same amount, payable to Union Bank. This payment reduced the balance to zero on a prior note given on November 6, 1974. Payments on the notes to Union Bank were made by 100 Oaks out of its own funds. The bank has never called upon petitioner to make payments on any of 100 Oaks' notes endorsed by him. Petitioner has never made any payments on such notes from his personal funds, and Union Bank has never suffered any loss from its loans to 100 Oaks. The funds borrowed from the bank were used in the general operation of 100 Oaks' business, including the purchase of inventory and the payment of salaries. Its inventory was purchased on open account or through "floor plan" financing. It did not pay for its *415 inventory in advance of receipt. At no time did suppliers ever cut off the supply of pianos and organs to 100 Oaks. On September 30, 1975, petitioner caused 100 Oaks to be liquidated and has since operated the business as a proprietorship. On his 1972 joint Federal income tax return (docket No. 5947-75), petitioner reported a loss of $51,518 as his share of the net operating loss of 100 Oaks for the corporation's fiscal year ended September 30, 1972. Respondent disallowed petitioner's loss deduction to the extent that it exceeded $32,244.83, that amount being determined by respondent to be petitioner's adjusted basis in amounts owed to him by 100 Oaks. OPINION Section 1374 allows each shareholder of an electing small business corporation a deduction for his pro rata share of the corporation's net operating loss for any taxable year. The shareholder's portion of such loss, however, is limited by section 1374(c)(2) [5] to the sum of (1) the adjusted basis of the shareholder's stock in the corporation as of the close of the corporation's taxable year, and (2) the adjusted basis of "any indebtedness of the corporation totheshareholder" (emphasis added). S. *416 Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, 1141. *417 Petitioner has been allowed deductions for 100 Oaks' net operating losses to the extent of his adjusted basis in the corporation's stock plus the amount of his loans to the corporation.Petitioner here contends that the loans obtained by 100 Oaks from Union Bank, which petitioner guaranteed, were in substance loans to petitioner and, in turn, loans of equal amounts from him to 100 Oaks. On this ground, petitioner maintains that he has a basis in such indebtedness under the provisions of section 1374(c), which entitles him to deduct his full share of 100 Oaks' net operating loss for its fiscal year ended September 30, 1972, as claimed on his Federal income tax return for that calendar year. We disagree. Petitioner concedes that a shareholder's guaranty of a corporate debt does not create an indebtedness from the corporation to the shareholder within the meaning of section 1374(c)(2)(B). Morris G. Underwood,63 T.C. 468, 475-477 (1975), affd. 535 F.2d 309 (5th Cir. 1976); Peter E. Blum,59 T.C. 436, 438 (1972); Milton T. Raynor,50 T.C. 762, 770-771 (1968); Joe E. Borg,50 T.C. 257, 264-265 (1968); *418 William H. Perry,47 T.C. 159, 163 (1966), affd. 392 F.2d 458, 461 (8th Cir. 1968). Only when the shareholder-guarantor actually pays the debt on behalf of the corporation does an indebtedness arise from the corporation to the shareholder. Putnam v. Commissioner,352 U.S. 82, 85 (1956); William H. Perry,47 T.C. at 164; see also Wheat v. United States,353 F.Supp. 720, 722 (S.D. Tex. 1973). It is, therefore, clear that the term "indebtedness" as used in section 1374(c)(2)(B) envisions an actual economic outlay by the shareholder beyond merely signing as guarantor or comaker of a negotiable instrument. William H. Perry,54 T.C. 1293, 1296-1297 (1970), affd. per order (8th Cir., May 12, 1971); Wheat v. United States,supra at 722. Petitioner argues, however, that the facts presented in the instant case are unique and require a result different from that reached in the above-cited cases. Specifically, petitioner points out that when Union Bank consolidated his personal loans with those of 100 Oaks in 1972, his personal obligation became interrelated with those of *419 100 Oaks. Because of this interrelation of his personal obligation with those of 100 Oaks, petitioner concludes that Union Bank was at all times dealing directly with him and that the substance of the transaction was a loan to petitioner followed by a loan by petitioner to 100 Oaks. Petitioner's reliance on this argument is misplaced. The record clearly reflects that the loans in question were carried on 100 Oaks' books as debts owing Union Bank and that Union Bank's records show the loans as owing from 100 Oaks. The loan agreement pursuant to which Union Bank advanced the funds was signed by 100 Oaks as the borrower to which the credit was extended. Petitioner signed the agreement only for the purpose of evidencing his agreement to the provisions affecting him. The security agreement refers to 100 Oaks as the "Debtor" and to the "personal guaranty" of petitioner. The notes were all signed by 100 Oaks and only endorsed by petitioner. All payments on the loans have been made by 100 Oaks, and petitioner has never been called upon to honor his personal guaranty. The fact that Union Bank consolidated petitioner's personal obligation of $13,500 with those of 100 Oaks does not *420 alter the character of the transaction. The loan agreement shows that, of the $132,000 line of credit extended by Union Bank, $61,000 was included to cover outstanding indebtedness of 100 Oaks and an additional $50,500 was to be loaned to 100 Oaks. It is true that, under the terms of the loan agreement, 100 Oaks assumed an obligation of petitioner's amounting to $13,500, but petitioner did not become the debtor to Union Bank for the corporation's loans. As a result of the loan transaction, the bank merely refinanced existing loans and provided additional working capital for 100 Oaks. Petitioner did not make the economic outlay necessary to establish a basis, within the meaning of section 1374(c)(2)(B), for indebtedness of the corporation to him. Morris G. Underwood,63 T.C. at 476. Citing the discussion in Peter E. Blum,supra at 440, petitioner appears to argue that, under the socalled debt-versus-equity line of cases, petitioner's guaranty of the bank loans constituted a basis-giving capital contribution which will support his claimed loss deductions. The argument lacks merit.As noted above the courts have repeatedly stated that section *421 1374(c)(2) is concerned with a shareholder's actual economic outlay. Morris G. Underwood,63 T.C. at 476-477; William H. Perry,54 T.C. at 1296; Wheat v. United States,supra at 722-723. The mere guaranty of a note does not involve an economic outlay even if the corporation whose debt is guaranteed is undercapitalized. Not until the guarantor pays on the obligation does he make an actual investment. Finally, petitioner argues that, since he could have borrowed directly from Union Bank instead of structuring the transaction as a loan obtained by 100 Oaks with his personal guaranty, the loans should be considered as his own personal obligation. Petitioner also maintains that Union Bank was at all times relying on his personal assets as security for the loans and, therefore, he should be considered as the primary obligor of the loans. Again, we disagree. Tax consequences must turn on what was done, not what might have been done. See Television Industries, Inc. v. Commissioner,284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959). Here, the taxpayer, for reasons not shown in the record, *422 chose to assume the role of a guarantor, not a borrower. We cannot now hold that he had a different role. Indeed, the corporation, not he, repaid the loans. His guaranty cost him nothing. In the case of small business corporations, it is the rule rather than the exception that shareholders guarantee corporate loans. To treat the loans petitioner guaranteed as loans made directly to him would require us, in effect, to disregard the existence of 100 Oaks. That we cannot do. Accordingly, under the decided cases, we must sustain respondent's determination that petitioner has been allowed deductions equal to his indebtedness basis under section 1374(c)(2)(B) in the Union Bank loans to 100 Oaks and is not entitled to the additional deductions he here claims. To reflect the foregoing and items not contested by petitioners, Decisions will be entered for the respondent.. Footnotes
1. Cases of the following petitioners are consolidated herewith: Mark O. Thompson, dkt. No. 5948-75, and Alicia B. Thompson, dkt. No. 5949-75.↩
2. Due to agreement between the parties, our holding on the issue presented for decision concerning the 1972 taxable year in dkt. No. 5947-75 will resolve the questions raised concerning the 1969 taxable year in dkt. Nos. 5948-75 and 5949-75. Respondent's deficiency and penalty addition to tax determined for 1973 in dkt. No. 5947-75 have not been contested by petitioners. ↩
3. All section references are to the Internal Revenue Code of 1954, as in effect during the taxable periods in issue.↩
4. Some of the stipulated exhibits use the name "100 Oaks Music Center, Inc.," rather than "Undred Oaks Music Center, Inc."↩
5. SEC. 1374(c). Determination of Shareholder's Portion.-- (1) In general.--For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss (computed as provided in section 172(c), except that the deductions provided in part VIII (except section 248) of subchapter B shall not be allowed) for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operating loss divided by the number of days in the taxable year. (2) Limitation.--A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of-- (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation).↩