ESTATE OF JOHN F. CAPELL, Deceased, ARVILLA YNEZ CAPELL, Executrix, and ARVILLA Y. CAPELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Capell v. Commissioner
Docket No. 8661-74.
United States Tax Court
T.C. Memo 1977-413; 1977 Tax Ct. Memo LEXIS 27; 36 T.C.M. (CCH) 1673; T.C.M. (RIA) 770413; November 30, 1977, Filed Wareham Seaman, Jr., for the petitioners. Warren N. Nemiroff, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes as follows: Year
Amount
1968
$6,380.94
1969
4,877.14
1970
5,924.19
1971
1,177.00
At issue is the character of a loss which petitioners sustained in 1971 upon the liquidation of Capell Associates, Inc. ("CAI"). Tax years prior to 1971 are involved as a result of a claimed net operating loss carryback. The parties have stipulated that the loss was composed of three basic components, namely: (1) One portion ($111,174) which is agreed to have been a bona fide debt of CAI to John F. Capell, which became worthless in 1971. The issue in respect of this amount is whether it was a business or a nonbusiness bad debt; (2) A second part ($16,843) which is agreed to have been John F. Capell's basis for his stock of *29 CAI. The issue in respect of this amount is whether the stock was a capital asset in his hands; (3) The final item ($16,842) represents additional cash advances made to CAI, which petitioners claim are either a business bad bad debt or a noncapital equity investment and which the Government asserts are a nonbusiness bad debt or the basis of a capital asset. FINDINGS OF FACT The parties have filed a stipulation of facts which, together with the exhibits attached thereto, is incorporated herein by this reference. At the time of the filing of the petition herein, petitioners were John F. Capell and Arvilla Y. Capell, a married couple who then resided in Lodi, California, and who had filed joint Federal income tax returns for the years 1968, 1969, 1970, and 1971. On or about April 10, 1976, John F. Capell died, and on or about September 20, 1976, his estate was substituted as a petitioner in this case. The matters in controversy herein are related to the business and investment activities carried on by John F. Capell during his lifetime. Prior to 1958, Mr. Capell was engaged in the business of real estate development either individually or in partnership with other developers. *30 His activities generally focused on the acquisition of raw land, its subsequent improvement and subdivision, and the sale of finished lots to builders. During 1958, Mr. Capell was advised by an attorney that certain tax advantages could be obtained if he conducted his real estate development activities through multiple corporations. Pursuant to this advice, Mr. Capell formed four corporations during 1958 and 1959, as follows: Name
Date
Capell Properties, Inc.
6/10/58
Capell Land Development Company, Inc.
5/21/59
Lodi Development Corp.
7/27/59
Cambridge Realty Corp.
10/26/59
Mr. Capell was the dominant figure in each of these corporations; at least until 1964 he owne most -- if not all -- of the stock of each one. The principal business of each of these corporations was real estate development, engaging in the subdivision and development of various properties. Some time prior to July 17, 1959, a group of investors who knew of Mr. Capell's reputation as a successful developer in the Lodi area, informed Mr. Capell of their desire to invest in a real estate development project with which he would be associated. These investors (John Mayo, Robert Hunnell, *31 Helmuth E. Hoff, Norman D. King, and Arthur C. Heckenlaible, sometimes hereinafter referred to in the aggregate as the "Associates") and Mr. Capell agreed as follows: 1. The Associates were to form a corporation to be known as Capell Associates, Inc. ("CAI"). Articles of Incorporation for CAI were filed with the Secretary of State of California on or about July 17, 1959. The Associates were to and did contribute a total of $70,000 to CAI in return for which they received all of the then issued stock of CAI in proportion to their respective capital contributions as follows: Name
Amount Contributed
Shares Received
Mayo
$25,000
250
Hunnell
15,000
150
Hoff
15,000
150
King
7,500
75
Heckenlaible
7,500
75 Mr. Capell was elected president and a director of CAI and he held these positions at all times relevant to this proceeding. 2. CAI would acquire certain real property. Mr. Capell, in his individual capacity, had entered into a contract to purchase a parcel of real estate from the Brentwood Realty Company. Mr. Capell and the Associates decided that CAI would purchase his interest in that contract and would then perform the purchaser's obligations *32 pursuant to the contract so as to become the owner of the property. 3. Mr. Capell would organize Lodi Development Company, Inc. ("Lodi") and the Associates would cause CAI "to retain * * * Lodi * * * for the purpose of supervising the subdivision and improvement of the real property" referred to above. Lodi was organized as described supra, p. 4. As compensation for its services to CAI, Lodi was to receive "one-half of the net profit after taxes derived from the sale of" CAI's property, subject to certain adjustments. 4. Mr. Capell and the Associates, as individuals, would share in any losses arising from endorsements made by any of them on behalf of CAI (for example, as guarantors of CAI's bank borrowings) in proportion to their respective interests in the profits of CAI, as follows: Name
Share of Losses
Capell
70/140
Hunnell
15/140
Mayo
25/140
Hoff
15/140
King
7.5/140
Heckenlaible
7.5/140
Thus organized and financed, CAI soon became involved in the real estate development project which led ultimately to the losses now in controversy. On or about November 16, 1959, CAI and one S. J. Torre entered into an agreement which provided for the *33 sale of real property owned by CAI to Torre. Torre was then to subdivide the property into lots for residential construction. Security Title Insurance Company ("Security Title") acted as the escrow holder for CAI in connection with this sale. The parties have stipulated that in May of 1960, Security Title "negligently" accepted deeds of trust containing terms and conditions different from those agreed to. These deeds of trust were subordinate to blanket deeds of trust securing construction loans. Torre and Golf Club Estates, Inc. [1] defaulted on their debt to CAI and Sacramento Savings and Loan. In early 1962, Sacramento Savings and Loan foreclosed and bought the property in a trustee's sale.Thus, CAI failed to receive any part of the $221,400 due to it, and it sued Security Title Insurance Company, Sacramento Savings and Loan, S. J. Torre, Golf Club Estates, Inc., and other parties to recover that amount plus interest. Between 1959 and *34 1964, Mr. Capell and each of the Associates loaned funds to CAI. By October of 1964, Mr. Capell had advanced $67,547.76 to the corporation and the Associates had advanced a total of $74,383. In addition CAI had borrowed substantial amounts from the Farmers and Merchants Bank of Lodi, such that as of September 1964 CAI owed the bank approximately $57,000. On August 31, 1964, CAI was informed by its attorney that the suit against Security Title, et al., could probably be settled if CAI would accept $70,000. However, this proposed settlement was rejected as unreasonably small. Trial of the suit in the Superior Court of the County of Sacramento ended on October 16, 1964. (As hereinafter noted, the decision subsequently reached in that case was not entered until July 19, 1965.) Prior to October 20, 1964, each of the Associates had expressed to Mr. Capell his concern about CAI's financial status and the handling of the lawsuit. At some time prior to October 20, 1964, and for a price not clearly revealed by the record, Mr. Capell or one of the other corporations in which he had an interest purchased from Heckenlaible all of his stock interest in CAI. Then by an agreement dated *35 October 20, 1964, Mr. Capell acquired from the other four Associates all their stock in CAI and also their rights to repayment of the advances which they had made to CAI. Mr. Capell further agreed to indemnify them should they be held liable to any third parties either as endorsers of CAI's notes or in any other capacity based on their now terminated status as stockholders of CAI. He specifically agreed that the nearly $57,000 then due the Farmers and Merchants Bank would be repaid by May 1, 1965. The agreement of October 20, 1964, provided that Mr. Capell would pay the four remaining Associates $100,000 for their stock and creditor interests in CAI, all of which was ostensibly allocated to the purchase of the stock held by the four Associates. Mr. Capell actually paid substantially less than the agreed price, however, and the parties have stipulated that the total price paid to the four Associates pursuant to the agreement of October 20, 1964, plus the price previously paid Mr. Heckenlaible for his interests, equalled $91,226. The parties have further stipulated, and we so find, that: 1. Mr. Capell's total basis for the stock of CAI which he acquired from all five Associates *36 was $16,843. 2. As a result of his purchase of all five Associates' creditor interests in CAI, Mr. Capell became a bona fide creditor of CAI to the extent of $74,382.53. In order to help finance Mr. Capell's obligations under the agreement of October 20, 1964, CAI borrowed $65,000 from the Farmers and Merchants Bank and then paid this amount to Mr. Capell, thus reducing CAI's indebtedness to him from $67,547.76 to $2,547.76. [2]CAI's $65,000 loan was in addition to another loan to it from the Farmers and Merchants Bank which was then outstanding; the balance in the latter loan on November 23, 1964, was $56,828.54. The bank's records indicate that on November 23, 1964, it made a new loan of $56,828.54 to CAI and on the same day the $56,828.54 balance then due on the old loan (which, in the October 20, 1964, agreement, Mr. Capell had promised to repay) was deemed repaid. Thus, as of November 23, 1964, CAI owed the Farmers and Merchants *37 Bank $121,828.54 and it owed Mr. Capell $76,930.29. The decision of the Superior Court in CAI's suit against Security Title, et al., was entered July 19, 1965. The Court ruled that CAI was entitled to a judgment against Security Title in the amount of $221,400 plus interest. The other defendants were found not liable. This decision was appealed, and on April 5, 1968, the Court of Appeal, Third Appellate District (Sacramento), held that none of the defendants was liable to CAI for any amount whatsoever. CAI exhausted all its appeal rights in 1968. The nature and extent of CAI's business activities between October 20, 1964, and April 5, 1968, are not clearly revealed by the record. The corporation was apparently continually short of the cash it needed to meet its ongoing expenses such as interest due to the Farmers and Merchants Bank, real estate taxes, and legal fees. However, while its financial position and the depressed state of the real estate market limited CAI's development activities during that time, it did consider possible alternative ventures and expected to repay its debts when it was paid the judgment it had won against Security Title. In the meantime, between *38 October 20, 1964, and April 1, 1968, Mr. Capell loaned a net additional $33,336.31 to CAI. After the decision in favor of CAI was reversed, Mr. Capell, as president of CAI, considered placing the company in bankruptcy. This possible course of action was rejected because: [It] would reflect not only on his credit rating but also on the rating of other companies on which he is the president. It would be impossible or very difficult for him to obtain future loans to pay the debt of his other companies and to start over again in the Real Estate Development business. Not only was CAI not placed in a state of bankruptcy, but in addition Mr. Capell continued to advance funds to the corporation to enable it to meet its obligations. A computation based upon materials in the record appears to show that between April 1, 1968, and the liquidation of CAI in 1971, Mr. Capell advanced a net amount of $17,749.40 to the corporation. [3] And although the corporation was liquidated in 1971, it reported in that year gross sales of residential lots of approximately $271,000, a closing inventory of about $158,000, and a net loss of nearly $10,000. *39 Mr. Capell in 1972 resumed development activities in his individual capacity both as a sole proprietor and in a partnership arrangement with another individual. Throughout the period 1959 through 1976, Mr. and Mrs. Capell, the partnerships in which he was a partner, and the corporations in which he was interested as a shareholder, director, and officer, borrowed substantial amounts of money from the Farmers and Merchants Bank of Lodi. The major portion of these borrowed funds was used in connection with the real estate development activities carried on by Mr. Capell or the entities with which he was associated. Many of these loans were payable on demand, and while many of them were made directly to corporations which Mr. Capell controlled, and were secured by deeds of trust on real property owned by the corporations, the bank also required and relied upon the Capells' continuing personal guarantee as additional security for these loans. The outstanding balances due on all these loans had been reduced to zero by the time of the trial herein. During the years 1958 through 1971, Mr. Capell received income in several different ways from the four corporations which he had organized *40 to conduct a real estate development business. In the first place, he was paid by each corporation a salary which was supposed to reflect his work on behalf of the corporation in connection with its current real estate development activities. The salaries which he received from these corporations are set forth in the following table: John F. Capell: Salaries From Corporations
Capell
Capell Year
Lodi
Cambridge
Properties
Land
Total
1958
$ 0
$ 0
$ 4,667
$ 0
$ 4,667
1959
0
400
7,400
600
8,400
1960
0
2,400
2,400
3,300
8,100
1961
600
2,400
1,600
3,900
8,500
1962
3,500
2,400
8 00
0
6,700
1963
3,600
2,400
2,000
0
8,000
1964
4,200
4,800
3,000
0
12,000
1965
3,600
4,200
15,000
0
22,800
1966
*
*
*
*
*
1967
0
10,600
2,150
0 **
12,750
1968
0
0
0
0
0
1969
7,948
0
0
0
7,948
1970
2,250
0
0
0
2,250
1971
1,200
0
0
0
1,200
$103,315
Secondly, *41 although none of these corporations ever declared any dividends in respect of their stock, Mr. Capell realized profits from the sale of stock in each of his four companies as shown by the following schedule: Name of
No. of
Gross Year
Company
Shares
Sales Price
Basis
Gain
1964
Capell
Properties
25 *
$15,000.00
$ 2,500
$12,500.00
1966
Capell
Land Dev.
100 *
14,933.75
10,000
4,933.75
Cambridge
Realty
10 *
7,574.53
1,000
6,574.53
Lodi
5 *
4,017.00
500
3,517.00
Development
1967
Capell
Land Dev.
100 **
54,672.71
10,000
44,672.71
1968
Capell
Properties ***
8,860.00
8,860.00
Lodi
Development ***
2,939.00
2,939.00
1969
Cambridge
Realty ***
7,359.00
7,359.00
$115,355.99
$24,000
$91,355.99
*42 The gains appearing in the foregoing schedule were reported and taxed as long-term capital gains. When CAI was liquidated in 1971, the net fair market value of the amounts received by Mr. Capell as a result of the liquidation was zero. In their 1971 joint Federal income tax return, the Capells claimed an ordinary loss of $130,838 as "losses from subdivision development" and a long-term capital loss of $16,843 attributable to the worthlessness of their shares of CAI. In his notice of deficiency the Commissioner determined that- the amount of $130,838.00 is not allowable as a business bad debt to you, because it was not created or acquired in connection with your trade or business, nor was its worthlessness incurred in your trade or business. The parties have now agreed that the total loss which petitioners sustained upon the liquidation of CAI was composed of the following elements, all of which are in controversy: 1. Basis of Capell's stock interest in CAI
$ 16,843
2. Amount of loss stipulated to be a bad debt
111,174
a. Capell's acquisition of the
creditor interests of the
Associates $74,383
b. Remainder of stipulated debt 36,791
3. Other cash advances to CAI
16,842 [4]
*43 OPINION John F. Capell sustained a loss of $144,859 in 1971 when CAI, a corporation in which he had "invested" that amount, was liquidated and his investment therein became unrecoverable. The ultimate question before us is how much, if any, of this loss is deductible as an ordinary rather than a capital loss. The answer to this ultimate question requires an essentially factual inquiry into the reasons why Mr. Capell invested in CAI.The record establishes that the total amount in issue was composed of several distinct components; the total can be classified according to the manner in which the investment was made (i.e., by direct advance of funds to CAI or by purchase from the original stockholders of their stock and creditor interests in CAI) and according to the time period in CAI's corporate existence when it was made. When the total is thus divided, the various motivations which guided Mr. Capell in making his investment may be readily understood, and the different portions of his loss properly characterized for tax purposes. *44 1. Was the $111,174 which CAI owed Mr. Capell a business or a nonbusiness debt? The parties have stipulated that CAI owed Mr. Capell a bona fide debt of $111,174 which became wholly worthless in 1971. Thus, the sole issue in respect of this amount is whether it was a business or a nonbusiness bad debt. Section 166(a) allows a deduction for any debt which becomes worthless during the taxable year. However, in the case of a taxpayer other than a corporation, section 166(d)(1) provides that the loss resulting from the worthlessness of a "nonbusiness debt" shall be treated as a short-term capital loss, and section 166(d)(2) defines the term "nonbusiness debt". Relevant portions of these provisions are set forth in the margin. [5]To fall outside the section 166(d)(2) definition of a nonbusiness debt, a debt must be "proximately" related to the taxpayer's trade or business. Section 1.166-5(b), Income Tax Regs. The existence of such a relationship is a question of fact *45 ( Shinefeld v. Commissioner,65 T.C. 1092, 1096), and to prevail, the taxpayer must prove that his dominant motivation in making the loan was concern for his trade or business. United States v. Generes,405 U.S. 93, 103; Smith v. Commissioner,60 T.C. 316, 317, opinion on remand of 55 T.C. 260. *46 As a general rule, the business of a corporation will not be attributed to its employees or shareholders ( Burnet v. Clark,287 U.S. 410; Dalton v. Bowers,287 U.S. 404; Whipple v. Commissioner,373 U.S. 193), and while serving as an employee of one or more corporations is a trade or business ( Trent v. Commissioner,291 F. 2d 669 (C.A. 2), reversing 34 T.C. 910; Primuth v. Commissioner,54 T.C. 374, 377), it is a trade or business separate from that carried on by the corporation. Estate of Byers v. Commissioner,57 T.C. 568, 578, affirmed 472 F.2d 590 (C.A. 6). A taxpayer in the trade or business of being an employee seeks income in the form of a salary paid by the corporation rather than in the form of dividends or capital gain based on the profitable operations of the corporation's business. Whipple v. Commissioner,supra,373 U.S. at 201-202; United States v. Generes,supra,405 U.S. at 100-101. Petitioners *47 advance two basic alternative positions in support of their contention that the $111,174 was a business bad debt. First, they allege that Mr. Capell was in the real estate development business in his individual capacity and that the loans to CAI were "integrally related" to that personal real estate development business. And secondly, they argue that Mr. Capell was in the trade or business of being a salaried employee of each of his corporations and that his dominant motivation for making the loans to CAI was to protect his salary. In response, the Government first denies that Mr. Capell, as an individual, was carrying on a real estate development business during the relevant period and, secondly asserts that the loans which Mr. Capell made to CAI were made primarily to protect his investment interest in CAI. While we hold that Mr. Capell was not personally engaged in the real estate business at the time the loans were made, and therefore reject petitioners' first position, we are persuaded that Mr. Capell's dominant motivation for advancing a portion of the amounts in question to CAI was to protect his position as a salaried employee of his corporations; therefore, that portion *48 of the advances created a business debt. The essence of petitioners' first contention is that in certain cases the business activities of a corporation controlled by an individual taxpayer will be attributed to the controlling individual and his personal trade or business will be defined by the combination of his personal activities and those of his corporations. Petitioners refer to this principle as the "Brown/Tibbals Rule" stating that it is derived from the cases of Brown v. Commissioner,448 F.2d 514 (C.A. 10), affirming 54 T.C. 1475, and Tibbals v. United States,362 F.2d 266 (Ct. Cl.). But, even if it were assumed that those two cases establish any such general principle, [6] the record in this case does not provide the factual basis upon which the proper application of such a principle would necessarily depend.
*49 To be sure, Mr. Capell as an individual was engaged in the real estate development business before 1959 and after 1971. However, the record will not support a finding that he carried on such a business [7] during the intervening years -- when CAI was in existence and when he made the loans in controversy. Insofar as the evidence reveals, during this time petitioner sold his interest in only two pieces of property to corporations with which he was involved: he sold his contract on the Brentwood tract to CAI and he sold a parcel in Capell Park to Capell Land Development Company, Inc. However, the critical fact which appears concerning these two sales, is that Mr. Capell neither sought nor made any profit on them -- in each case he sold his interest in the land to the corporation for the same price which he had paid to acquire it. Cf. Hirsch v. Commissioner,315 F.2d 731, 736 (C.A. 9), affirming a Memorandum Opinion of this Court. Thus limited, Mr. Capell's personal real estate development activities during the relevant years stand in sharp contrast to those of the taxpayers in Brown and Tibbals. For in those cases, not only was there significantly more *50 activity overall, but in fact, the very gain whose characterization was in controversy, was realized by the taxpayers as a result of sales to their controlled corporations. See, Brown v. Commissioner,supra, 54 T.C. at 1486; Tibbals v. United States,supra,362 F.2d at 271. And Mrs. Capell's testimony concerning Mr. Capell's business activities was far too vague to provide adequate support for petitioners' contention in this regard. Thus, we cannot find here either "substantial personal developmental activities" or "comparable purchases * * * of other real estate for development" by Mr. Capell during the years in question. Tibbals v. United States,supra,362 F.2d at 271. The conclusion that Mr. Capell was not personally engaged (other than as an employee of his corporations) in the trade or business *51 of real estate development during the time in question, leads to the consideration of petitioners' alternative contention, namely, that the loans in controversy were made to protect his trade or business of being a salaried corporate employee. To discern Mr. Capell's motives for making these loans, we must, of course, follow the objective approach taken by the Supreme Court in United States v. Generes,supra,405 U.S. at 106-107; cf. Mann v. Commissioner,T.C. Memo. 1975-74, 34 T.C.M. 377, 381; Doerfler v. Commissioner,T. C. Memo. 1977-193, 36 T.C.M. 789, 792. Indeed, since Mr. Capell had died prior to the trial herein, our conclusions must necessarily rest almost exclusively on the external circumstances surrounding the transactions in question. Mr. Capell's creditor interest in CAI had two distinct components: one part resulted from his direct advances to the corporation, in the amount of $36,791; while the second part resulted from his acquisition of the Associates' creditor status vis-a-vis CAI, in the amount of $74,383. [8] And while it is apparent that the whole of Mr. Capell's $111,174 creditor interest in CAI was *52 based on both business and investment considerations, we think that the direct advances were made for predominantly business reasons, but that the assumption of the Associates' creditor interest was the result of primarily investment concerns. The overall pattern of Mr. Capell's business and investment *53 activity in the real estate field suggests most strongly that he made the direct advances to CAI primarily to protect the salary income which he was receiving as an employee of his various corporations. The successful operation of all five corporations in which he had a controlling interest required substantial amounts of outside capital, and the availability of this capital depended, in turn, upon his personal reputation. In fact, the Associates first approached Mr. Capell precisely because of his good reputation. And, relying in part on Mr. Capell's personal guarantee, the Farmers and Merchants Bank had loaned large amounts to each of his corporations. Many of these loans were payable on demand, and such a demand might well have been made if the bank had felt that the security provided by Mr. Capell's personal credit worthiness was impaired. Thus, if CAI had gone bankrupt, Mr. Capell's reputation would have been damaged and as a result the operations of each of his other corporations would have been adversely affected. Moreover, the record plainly establishes that CAI was sorely in need of funds; without the advances from Mr. Capell it might have defaulted on its obligations. *54 In addition, the amount of the direct advances ($36,791) was reasonable in comparison to the total salary income which Mr. Capell received from his employment ($103,315). Cf. United States v. Generes,supra,405 U.S. at 106-107. Although the matter is by no means free from doubt, we are nevertheless persuaded on balance that Mr. Capell advanced the funds in question primarily to avoid the possibility of default and thus to protect his position as a salaried employee of all his corporations. The advances therefore gave rise to business bad debts. Cf. Gould v. Commissioner,64 T.C. 132, 135; Smith v. Commissioner,supra,60 T.C. at 320; Stern v. Commissioner,T.C. Memo. 1976-245, 35 T.C.M. 1061, 1065. The circumstances surrounding Mr. Capell's acquisition of the Associates' claims against CAI are quite different. In the first place, there is no evidence that these original investors intended to press for repayment of their advances to CAI and thereby bankrupt it, damaging Mr. Capell's credit reputation. Nor does it seem plausible that they would have done so, since they alone -- as stockholders *55 -- would bear at least the first $70,000 of any loss which such an action might cause. Secondly, the form in which this transaction was arranged as well as the circumstances surrounding it establish affirmatively that Mr. Capell was motivated primarily by investment considerations. The October 20, 1964, agreement -- which formed the basis for the buy-out of the Associates -- ostensibly allocated the entire consideration to be paid to the acquisition of their stock. While there is now no question that the bulk of the total consideration actually paid pursuant to this agreement is properly allocable to the purchase of the Associates' creditor interest in CAI, the agreement itself indicates that Mr. Capell's primary concern was to become the sole owner of CAI and that the assignment of the Associates' claims against the corporation was merely a subsidiary aspect of this goal. The record also strongly suggests the basis upon which Mr. Capell's investment motives rested -- he was confident that CAI would win its lawsuit and be awarded a substantial judgment; indeed, he and the Associates entered into their agreement just four days after the trial of CAI's suit ended. And, of course, *56 if he had been correct, he would have been the sole owner of a corporation whose assets substantially exceeded the amount he had paid to acquire its stock. Thus, since Mr. Capell acquired the Associates' creditor interest in CAI primarily as an investment, the debts were nonbusiness bad debts. 2. Was the stock of CAI which Mr. Capell acquired from the Associates for $16,843 a capital asset in his hands? While the evidence on this point was not entirely clear, the parties have in effect stipulated that Mr. Capell paid $16,843 to buy the stock of CAI from the Associates. The question in respect of this amount is whether this stock was a capital asset in his hands so that the loss upon its having become worthless is deductible only in accordance with section 165(f) and (g). Section 1221 defines as capital assets all except for certain specified categories of property. However, it has been authoritatively determined that some property although not described in any of the enumerated statutory exceptions to the definition is nevertheless to be excluded from the category of capital assets. *57 This judicially created addition to the exclusions from capital asset status depends upon a determination that the property in question is "integrally related" to the everyday operations of the taxpayer's business. Corn Products Refining Co. v. Commissioner,350 U.S. 46. This Court has held that property such as corporate stock will be classified as a noncapital asset, if it was acquired without substantial investment intent and held for reasons related to the taxpayer's trade or business. W.W. Windle Co. v. Commissioner,65 T.C. 694, 712, appeal dismissed without consideration of this issue, 550 F.2d 43 (C.A. 1), certiorari denied     U.S.    , (June 13, 1977); Bell Fibre Products Corp. v. Commissioner,T.C. Memo 1977-42, 36 T.C.M. 182. We hold that the stock which Mr. Capell purchased from the Associates was a capital asset in his hands because its purchase was primarily motivated by investment considerations. Essentially the same factors which led us to conclude that he purchased the Associates' creditor interests in CAI for investment reasons (see supra, pp. 25-27) lead us now to a similar conclusion *58 as to his reasons for buying their stock; they need not be repeated at length here. Briefly, we rejected the contention that Mr. Capell bought out the Associates primarily to protect his business and credit reputation because we were unable to find that their claims against CAI posed any real threat to his reputation.This lack of a credible danger to Mr. Capell's business interests (i.e., the protection of his salary income) stands in sharp contrast to the very real possibility that as a result of its lawsuit CAI would win a substantial judgment award which would benefit its stockholders. Thus, we could not nearly find on the basis of the record now before us that Mr. Capell acted without any substantial investment motive when he acquired the stock of CAI. Therefore that stock was a capital asset in his hands. 3. The remaining $16,842.The final sum in controversy is based on $16,842 of direct advances from Mr. Capell to CAI. Petitioners contend that because Mr. Capell had personally guaranteed the debts owed by CAI to the Farmers and Merchants Bank, and because the $16,842 was advanced to CAI so that it could meet its obligations to the bank, the amount so advanced gave *59 rise to a debt of CAI to Mr. Capell. In support of this contention, petitioners cite the case of Myers v. Commissioner,42 T.C. 195.In that case, a deduction was allowed for amounts expended by a construction partnership to fulfill its contractual obligations (in the nature of a guarantee) to deliver finished houses. The deduction was allowed even though when the expenditures were made the partnership knew that in spite of its rights (under a second contract) to be reimbursed for these expenses, it would not in fact be reimbursed because of the insolvency of the primary obligor under the second contract. Although the record is not as clear as it might have been, on balance it supports petitioners' position in respect of these advances. It should be remembered, first of all, that these funds were made available to CAI during the final period of its existence -- from the time it lost its lawsuit until it was liquidated. By then it was apparent that there was no real hope that the corporation would ever become a profitable investment in its own right. [9] In the circumstances, we think it reasonable to accept petitioners' assertion that Mr. Capell supplied these *60 funds to CAI because of his obligation as the guarantor of CAI's debts. Since these advances were made pursuant to Mr. Capell's obligation under the guarantee, they must be considered bad debts under section 166(d), see Putnam v. Commissioner,352 U.S. 82, 88; Stoody v. Commissioner,66 T.C. 710, 715; Estate of Byers v. Commissioner,supra,57 T.C. at 574-575, and their deductibility depends upon the situation at the time Mr. Capell entered into the guarantee. *61 French v. United States,487 F. 2d 1246, 1248 (C.A. 1); Roussel v. Commissioner,37 T.C. 235, 242-243. [10] At that time, CAI's financial posture was such that direct advances would have created true loans. Moreover, by entering into the guarantee Mr. Capell could only have been seeking to enhance his income as a salaried corporate employee -- since he did not then own any stock of CAI. Thus the bad debts which ultimately resulted were business bad debts. See Smith v. Commissioner,supra,60 T.C. at 320; compare Estate of Byers v. Commissioner,supra,57 T.C. at 575-578. To summarize, we have held that petitioners are entitled to the following deductions: (1) a business bad debt of $53,633 (the entire amount of Mr. Capell's direct advances to CAI); (2) a nonbusiness bad debt of $74,383 (the creditor interest in CAI which Mr. Capell purchased from the Associates); and (3) a capital loss of $16,843 (the basis of the stock which he purchased from the Associates). [11]
*62 Decision will be entered under Rule 155. Footnotes
1. These findings are based largely upon the stipulation of the parties, which leaves many matters in confusion, including, among others, the precise nature of "Golf Club Estates, Inc." and its relationship to the transactions in issue.↩
2. These figures reflect CAI's indebtedness to Mr. Capell based on his direct advances to the corporation and are separate from the corporate indebtedness to him which was based on his acquisition of the creditor interests of the Associates.↩
3. This amount is computed as follows: Stipulated Total of Advances in Controversy
$128,016.00
Less: Amount advanced by Associates
$74,382.53
Amount advanced as of 11/23/64
2,547.76
Amount advanced 11/23/64-4/1/68
33,336.31
$110,266.60
110,266.60 Equals: Amount Advanced 4/1/68--Date of Liquidation $17,749.40↩
*. Amount cannot be determined from the record. ** A resolution providing for the complete liquidation of Capell Land Development Co., Inc. was approved by the company's board of directors on January 23, 1967.↩
*. In each case, the number of shares transferred represented one-half of the total number of shares outstanding. Each of these sales was made to one individual, namely, Robert Houston, who was in some way associated with the City of Lodi Planning Commission. ** Redemption in complete liquidation of Capell Land Development. *** The record does not indicate the number of shares sold, or the identity of the buyer.↩
4. The possible discrepancy between this stipulated figure and the figure derived through computation at footnote 3, supra,↩ is unexplained.
5. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
6. In our view, the central teaching of the cases which seek to define an individual's trade or business by reference to the activities of his controlled corporation, is that the issue is inherently one which must be decided with particular emphasis on the specific facts of each case. Brown v. Commissioner,supra, 54 T.C. at 1487 and 1490; Browne v. United States,356 F. 2d 546 (Ct. Cl.). And, although this Court in Brown quoted at length from the Tibbals opinion, we specifically declined to rest our result solely upon what we called the "broader lines that were indicated" therein. Brown,supra, 54 T.C. at 1488. See also Turner v. Commissioner,T.C. Memo. 1974-264, 33 T.C.M. 1167, 1182, which after citing Tibbals, went on to state: "Here the taxpayer's own frequent and substantial purchases and sales of real estate, coupled with his own substantial development activities * * * are sufficient in themselves↩ to put him in the business of buying and selling real estate * * *." (Emphasis supplied.)
7. The Capell's joint Federal income tax returns for these years do indicate that they were holding some rental properties during this time. However, neither party has suggested that these properties were in any way connected with Mr. Capell's real estate development business which is the focus of this case.↩
8. Petitioners suggest that the $65,000 which CAI borrowed from the bank and paid to Mr. Capell (and which he then used to buy out the Associates) should be treated as if it had been borrowed by Mr. Capell directly and so considered a part of his direct advances to CAI. The short answer to this contention is that taxation depends upon what was done, not upon what might have been done. Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 148-149; cf. Thompson v. Commissioner,T.C. Memo 1977-35, 36 T.C.M. 157↩, 161. And not only does the record herein provide inadequate factual support for petitioners' assertion that the "substance" of the transaction was a personal loan to Mr. Capell, but even if such a characterization were appropriate the tax consequences which would follow from taking that view are not at all certain.
9. What evidence there is suggests that the corporation's prospects were bleak. Thus, CAI's 1970 tax return shows a deficit of $236,381 in its retained earnings account at the beginning of that taxable year and of $249,087 at the close of the period; by the end of its 1971 taxable year, the deficit had increased to $259,002. Minutes of the corporation's board of directors indicate that the Company was short of funds; that its property was subject to encumbrances which exceeded its fair market value; that it considered allowing itself to be acquired by a purchaser who could use the tax benefit of its net operating loss carry-forward; and that it considered bankruptcy.↩
10. See Cho v. Commissioner,T.C. Memo. 1976-318, 35 T.C.M. 1442↩, 1446.
11. On July 14, 1977, the respondent filed a "Motion For Partial Summary Judgment" in which he contested petitioners' claim for an award of attorneys' fees which had been included in an amendment to the petition. Wholly apart from problems that would be raised by reason of our disposition of this case on the merits, this Court is without power to make any such award of attorneys' fees. Key Buick Co. v. Commissioner,68 T.C. 178↩, on appeal C.A. 5. The respondent's motion will therefore be granted.